# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1558

_____

281 Care Committee; Ron Stoffel;          *
W.I.S.E. Citizen Committee; Victor        *
E. Niska; Citizens for Quality            *
Education; Joel Brude,                     *
                                          *
         Plaintiffs/Appellants,           *
                                          *
    v.                                     *
                                          *
Ron Arneson, in his official capacity     *
as County Attorney for                    *
Blue Earth County, Minnesota, or his      *   Appeal from the United States
successor; Mike Freeman, in his           *   District Court for the
official capacity as County Attorney      *   District of Minnesota.
for Hennepin County, Minnesota,           *
or his successor; Michael Junge, in his   *
official capacity as County Attorney      *
for McCleod County, Minnesota, or his     *
successor; Tom N. Kelly, in his official  *
capacity as County Attorney for Wright    *
County, Minnesota, or his successor;      *
Lori Swanson, in her official capacity    *
as the Minnesota Attorney General or      *
her successor,                            *
                                          *
         Defendants/Appellees.            *

_____

Submitted: November 17, 2010
Filed: April 28, 2011

_____

Before SMITH, BEAM and BENTON, Circuit Judges.
_____

BEAM, Circuit Judge

In this First Amendment challenge to a Minnesota law that makes it a crime to knowingly or with reckless disregard for the truth make a false statement about a proposed ballot initiative, plaintiffs appeal: (1) the district court's dismissal of plaintiffs' complaint for lack of subject-matter jurisdiction; (2) the district court's alternate holding that it would dismiss plaintiffs' complaint for failing to state a claim upon which relief could be granted; and (3) the district court's denial of plaintiffs' motion for summary judgment. We reverse the dismissal of plaintiffs' complaint and remand for proceedings consistent with this opinion.

## I.    BACKGROUND

Plaintiffs are three Minnesota-based grass-roots-advocacy organizations along with their corresponding leaders. Each organization was founded to oppose school-funding ballot initiatives, which Minnesota law authorizes individual school boards to propose. These ballot initiatives ask county taxpayers to approve bond hikes or tax levies designed to increase funding to the local school districts. Plaintiffs claim that a provision of the Minnesota Fair Campaign Practices Act (FCPA) inhibits plaintiffs' ability to speak freely against these ballot initiatives and, thereby, violates plaintiffs' First Amendment rights. Defendants are four Minnesota county attorneys and the Minnesota attorney general, all sued in their official capacities.

In relevant part, the challenged provision of the FCPA provides:

> A person is guilty of a gross misdemeanor who intentionally participates in the preparation, dissemination, or broadcast of paid political advertising or campaign material . . . with respect to the effect of a ballot

question, that is designed or tends to . . . promote or defeat a ballot question, that is false, and that the person knows is false or communicates to others with reckless disregard of whether it is false.

Minn. Stat. § 211.B06, subd. 1 (2008). Minnesota has a long history of regulating knowingly false speech about political candidates; it has criminalized defamatory campaign speech since 1893. However, the FCPA's regulation of issue-related political speech is a comparatively recent innovation. Minnesota did not begin regulating knowingly false speech about ballot initiatives until 1988. Between 1988 and 2004, the FCPA's regulation of speech regarding ballot initiatives allowed for only one enforcement mechanism: mandatory criminal prosecution of alleged violators by county attorneys. In 2004, the Minnesota legislature amended the FCPA to provide that alleged violations of section 211.B06 initially be dealt with through civil complaints filed with the Office of Administrative Hearings (OAH). The revised version of section 211.B06 authorizes any person, organization or agency to file a complaint with the OAH, and gives county attorneys discretion to determine whether to bring criminal charges after civil proceedings are complete.

In 2006, the B.U.I.L.D. Citizen Committee–a citizen group that campaigned in support of a school-funding ballot initiative in Howard Lake, Waverly-Winsted Independent School District–filed an OAH complaint against plaintiffs W.I.S.E. Citizen Committee and its Chairperson Victor Niska. The complaint alleged that W.I.S.E. and Niska prepared and distributed, in violation of section 211.B06, campaign materials containing statements of fact that W.I.S.E. and Niska knew to be false. After reviewing the complaint, an OAH judge found that the complainants had established a prima facie case against W.I.S.E. and Niska and scheduled an evidentiary hearing. Following the hearing several months later, an OAH panel dismissed the complaint. W.I.S.E. and Niska spent over $1,900 in legal fees defending against the complaint.

In the fall of 2007, plaintiff 281 Care Committee and its leader plaintiff Ron Stoffel campaigned against a school-funding ballot initiative proposed by the Robbinsdale Public School District. After a vigorous campaign, the ballot initiative was rejected. On November 8, 2007, the Superintendent of the Robbinsdale Public School District told statewide media that the district was investigating 281 Care Committee and exploring ways to deal with the "false" information it spread about the initiative. Plaintiff Stoffel alleges that he interpreted these statements, which were published in the Minnesota Star Tribune and played on Minnesota Public Radio, as a warning that litigation would follow if 281 Care Committee continued using the same tactics to oppose ballot initiatives.

All plaintiffs allege that, given the above-described occurrences, plaintiffs have been chilled from, and continue to be chilled from, vigorously participating in the debate surrounding school-funding ballot initiatives in Minnesota. In particular, plaintiffs allege they declined to participate in a 2008 campaign regarding a school-funding ballot initiative for the Orono School District because they feared repercussions arising from section 211.B06.

In the wake of these events, plaintiffs filed a suit in federal district court, alleging that section 211B.06 violates the First Amendment. Plaintiffs moved for summary judgment and defendants filed a motion to dismiss for lack of subject-matter jurisdiction and failure to state a claim. The district court granted defendants' motion, holding that plaintiffs lacked standing and that their claim was not ripe. The district court also held that, even if it had subject-matter jurisdiction, it would dismiss plaintiffs' complaint for failing to state a claim upon which relief could be granted. The court denied plaintiffs' motion for summary judgment, finding it was moot in light of the court's ruling. Plaintiffs appeal.

## II. DISCUSSION

This case involves a fundamental question about the ability of a state, under the First Amendment, to enact a statute restricting a category of political speech–namely, knowingly or recklessly false speech about a ballot initiative–without demonstrating that the enacted statute is narrowly tailored to a compelling state interest. The court below held that plaintiffs' challenge to section 211.B06 was not justiciable because plaintiffs lacked standing and their claim was not ripe. The district court also held, in the alternative, that if plaintiffs did have standing, their complaint failed to state a claim because section 211.B06 fell outside the protection of the First Amendment. We reject each of these holdings.

### A. Justiciability

Those who invoke federal subject-matter jurisdiction must "demonstrate an actual, ongoing case or controversy within the meaning of Article III of the Constitution." Republican Party of Minn. v. Klobuchar, 381 F.3d 785, 789-90 (8th Cir. 2004) (internal quotations omitted). We review de novo the district court's dismissal of plaintiffs' complaint for lack of federal subject-matter jurisdiction. Hansen v. United States, 248 F.3d 761, 763 (8th Cir. 2001).

Here, the district court held that it lacked subject-matter jurisdiction because (1) plaintiffs lack Article III standing, and (2) plaintiffs' claim is not ripe. On appeal, defendant Lori Swanson, the Minnesota Attorney General, additionally argues, as she did below, that this court lacks subject-matter jurisdiction over the claim against her because she is entitled to Eleventh Amendment immunity. We reject these arguments and conclude that plaintiffs' claims are justiciable and that subject-matter jurisdiction is proper in federal court.

### a.    Article III Standing

Standing is always a "threshold question" in determining whether a federal court may hear a case.  Eckles v. City of Corydon, 341 F.3d 762, 767 (8th Cir. 2003).  A party invoking federal jurisdiction has the burden of establishing that he has the right to assert his claim in federal court.  Schanou v. Lancaster Cnty. Sch. Dist. No. 160, 62 F.3d 1040, 1045 (8th Cir. 1995).  This requires establishing three elements: (1) that he suffered concrete, particularized injury in fact; (2) that this injury is fairly traceable to the challenged action of defendants; and (3) that it is likely that this injury will be redressed by a favorable decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-61 (1992).  The court below concluded that plaintiffs failed to establish that they had suffered an injury in fact. On appeal, defendants also argue that plaintiffs lack standing because plaintiffs have not established that any injury they did suffer is likely to be redressed by a favorable decision.  We reject these arguments.

To establish injury in fact for a First Amendment challenge to a state statute, a plaintiff need not have been actually prosecuted or threatened with prosecution.  St. Paul Area Chamber of Commerce v. Gaertner, 439 F.3d 481, 487 (8th Cir. 2006).  Rather, the plaintiff needs only to establish that he would like to engage in arguably protected speech, but that he is chilled from doing so by the existence of the statute.  Self-censorship can itself constitute injury in fact.  See Virginia v. Am. Booksellers Ass'n, 484 U.S. 383, 393 (1988).  Of course, self-censorship based on mere allegations of a "subjective" chill resulting from a statute is not enough to support standing, Laird v. Tatum, 408 U.S. 1, 13-14 (1972), and "persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs."  Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979).  The relevant inquiry is whether a party's decision to chill his speech in light of the challenged statute was "objectively reasonable."  Zanders v. Swanson, 573 F.3d 591, 594 (8th Cir. 2009).   Reasonable chill exists when a plaintiff shows "an intention to engage in a course of conduct arguably affected with a constitutional interest, but

proscribed by [the] statute, and there exists a credible threat of prosecution." Babbitt, 442 U.S. at 298.

The district court concluded that plaintiffs' decision to chill their speech was not objectively reasonable for two reasons. First, the court held that, because the relevant provision of section 211.B06 has not been regularly enforced, plaintiffs face no credible threat of prosecution. Second, the court held that none of plaintiffs' speech could have been reasonably chilled by section 211.B06 because plaintiffs have not alleged that they wish to engage in any conduct that would actually violate the statute. We conclude that neither reason is convincing and that plaintiffs have made legally sufficient allegations to support a finding that their speech was reasonably chilled by section 211.B06.

First, we disagree with the district court's conclusion that the infrequent enforcement of section 211.B06 undermines the objective reasonableness of plaintiffs' decision to chill their speech. Total lack of enforcement of a statute can itself undermine the reasonableness of chill allegedly resulting from that statute, but only in extreme cases approaching desuetude. St. Paul Area Chamber of Commerce, 439 F.3d at 486. Here, the district court emphasized that there have been no criminal prosecutions under section 211.B06 since the statute was amended in 2004 and that defendants have not themselves initiated any civil proceedings under the statute since 2004. Relying on these facts, the district court cited Poe v. Ullman, 367 U.S. 497, 508 (1961), and concluded the prospect of a prosecution under section 211.B06 is "speculative and hypothetical in the extreme" and, thus, that plaintiffs' fear was not objectively reasonable. This conclusion was erroneous.

The district court's reliance on Poe is misplaced. Poe involved a statute that had been enforced only once in the more than eighty years since it had been adopted. 367 U.S. at 501. Section 211.B06, on the other hand, was adopted comparatively recently and was amended fewer than five years before this suit was filed. The Supreme Court

has repeatedly found that plaintiffs have standing to bring pre-enforcement First Amendment challenges to criminal statutes, even when those statutes have never been enforced. See, e.g., Babbitt, 442 U.S. at 302; Doe v. Bolton, 410 U.S. 179, 188 (1973). It is only evidence–via official policy or a long history of disuse–that authorities actually reject a statute that undermines its chilling effect. Defendants have neither established a long history of disuse nor produced a clear statement by proper authorities that they do not intend to enforce the statute. See United Food & Commerical Workers Int'l Union v. IBP, Inc., 857 F.2d 422, 429 (8th Cir. 1988) (representation by state officials that they have "no present plan" to enforce a statute did not divest standing to challenge the statute because the state's position was not binding and could change). Therefore, we conclude that section 211.B06 presents a credible threat of prosecution sufficient to support a claim of objectively reasonable chill in the First Amendment context.

Second, we disagree with the district court's conclusion that plaintiffs have not established objectively reasonable chilled speech because they have not alleged that they wish to engage in conduct that actually violates section 211.B06. We acknowledge that plaintiffs have not alleged that they wish to knowingly make false statements of fact. However, plaintiffs *have* alleged that they wish to engage in conduct that could reasonably be interpreted as making false statements with reckless disregard for the truth of those statements and that, therefore, they have reasonable cause to fear consequences of section 211.B06. We hold that, given the specifics of the challenged statute and the nature of the standing analysis in First Amendment political speech cases, this is enough to establish that plaintiffs' decision to chill their speech was objectively reasonable.

A First Amendment plaintiff does not always need to allege a subjective intent to violate a law in order to establish a reasonable fear of prosecution. The Supreme Court has made clear that, at least when intent is not an element of a challenged statute that prohibits some category of false speech, the likelihood of inadvertently or

-8-

negligently making false statements is sufficient to establish a reasonable fear of prosecution under the statute. Babbitt, 442 U.S. at 301-02. Defendants argue that Babbitt is irrelevant here because–unlike the statute challenged in Babbitt– section 211.B06 has an intent requirement. They urge that this case is, instead, controlled by our decision in Zanders, 573 F.3d 591. In Zanders, we denied standing to plaintiffs who attempted to challenge a statute that made it a crime to knowingly make a false report of police misconduct. Id. at 592. We reasoned that, because the plaintiffs did not allege they intended to knowingly make false reports, they could not reasonably fear consequences from the challenged statute. But Zanders does not settle the question here.

In Zanders, the plaintiffs' claim of standing was based on their speculative fear that police officers would engage in bad-faith conduct and wrongfully accuse citizens of making false reports when the officers knew the reports to be true. Id. at 594. Our decision to deny standing turned on the fact that we believed the Zanders plaintiffs to:

> fail in the key respect of asserting that peace officers in fact initiate retaliatory prosecution in instances where the peace officers believe that the allegations are truthful, or at least not knowingly false. It is too speculative for standing purposes to allege that this statute could be manipulated or that the police might misuse the criminal justice system for retaliatory purposes.

Id. The Zanders plaintiffs presented no evidence that there was a likelihood that officers would mistakenly believe citizens were making knowingly false statements, which was unlikely given that officers would have personal knowledge about misconduct in which they were allegedly involved. Here, on the other hand, plaintiffs' fear of the statute does not rest upon such speculative notions of bad faith. Rather, we conclude that–given the scope, context, and enforcement structure of section 211.B06–plaintiffs have made sufficient allegations of objectively reasonable chill.

The chilling effects of section 211.B06 cannot be understood apart from the context of the speech it regulates: political speech about contested ballot initiatives. Plaintiffs persuasively argue that deciding whether a statement was made with "reckless disregard for the truth" in the political-speech arena often proves difficult;[1] this inquiry leaves substantially more room for mistake and genuine disagreement than does, as was relevant in Zanders, deciding whether a citizen knowingly made a false report about factual allegations of police misconduct. Plaintiffs allege a desire to use political rhetoric, to exaggerate, and to make arguments that are not grounded in facts. In turn, they have presented allegations of their reasonable worry that state officials and other complainants–including their political opponents who are free to file complaints under the statute–will interpret these actions as violating the statute. See Mangual v. Rotger-Sabat, 317 F.3d 45, 58 (1st Cir. 2003) (allowing pre-enforcement challenge to criminal libel statute where plaintiff did not admit he wanted to commit criminal libel but wanted to publish articles that would "exacerbat[e his] exposure to a criminal libel prosecution"). We cannot say that plaintiffs' fears are "imaginary" or "wholly speculative." Babbitt, 442 U.S. at 302. The tactics plaintiffs have clearly alleged that they want to use come close enough to speaking with reckless disregard

_____

[1]The difficulty of making this distinction is reflected in cases dealing with defamation against public officials. Courts and scholars constantly struggle to draw a line between knowingly or recklessly false statements and uses of rhetoric, exaggeration, and ideologically-derived facts. See, e.g., Greenbelt Coop Publ'g Ass'n v. Bressler, 398 U.S. 6, 14 (1970) (allegedly false statement that city council member blackmailed someone was "no more than rhetorical hyperbole"); Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin, 418 U.S. 264, 284 (1974) (holding that the use of the word "traitor" could not be reasonably interpreted as a representation of fact because it was used "in a loose, figurative sense to demonstrate the union's strong disagreement with the views of those workers who oppose unionization"); Terri R. Day, "Nasty as They Wanna be Politics:" Clean Campaigning and the First Amendment, 35 Ohio N.U. L. Rev. 647, 652 (2009) ("Often characterized as hyperbole and overstatement, campaign speech is meant to persuade and, as such, tends toward exaggeration, to vilification . . . and even to false statement.") (internal quotation omitted).

-10-

for the truth that we can say it would be objectively reasonable for plaintiffs to modify those tactics in light of potential consequences from section 211.B06. See Majors v. Abell, 317 F.3d 719, 721 (7th Cir. 2003) (plaintiffs need only allege they wish to engage in activity that the challenged statute "arguably covers" because "most people are frightened of violating criminal statutes").

The reasonableness of plaintiffs' fear is also underscored by the fact that, in the past, plaintiffs' speech has triggered threats and the filing of one complaint under section 211.B06. See United Food & Commercial Workers Int'l Union, 857 F.2d at 427 (noting that past experience with a statute is relevant to standing determination). Although no complaints against the plaintiffs ever reached the criminal stage and no criminal prosecution was ever threatened, non-criminal consequences contemplated by a challenged statute can also contribute to the objective reasonableness of alleged chill. Babbitt, 442 U.S. at 302 n.13 (noting that possible administrative and civil sanctions provide "substantial additional support for the conclusion that appellees' challenge to the publicity provision is justiciable"); Vermont Right to Life Comm. v. Sorrell, 221 F.3d 376, 382 (2d Cir. 2000) (finding standing and noting that fear of civil penalties can be as inhibiting of speech as fear of criminal prosecution). Although the civil complaint against plaintiff 281 Care Committee was ultimately dismissed, this happened only after a prima facie violation was found and after plaintiffs spent several months and $1,900 in attorney fees litigating the matter. This complaint–and the other complaints threatened–give plaintiffs grounds to reasonably fear that, unless they modify their speech, they will be subject to the hassle and expense of administrative proceedings.

"Under these circumstances, we find that plaintiffs are not simply attempting to obtain an advisory opinion or to enlist the court in a general effort to purge the [Minnesota] statute books of unconstitutional legislation." United Food & Commercial Workers Int'l Union, 857 F.2d at 430. The record before us indicates that plaintiffs have modified their speech in light of section 211.B06. We conclude that, if the statute

-11-

survives, it may well be objectively reasonable for plaintiffs to continue to do so. Standing analysis under the First Amendment is intended to allow challenges based on this type of injury. See Dombrowski v. Pfister, 380 U.S. 479, 486 (1965) (recognizing the "sensitive nature of constitutionally protected expression" in permitting a pre-enforcement action involving the First Amendment). Thus, the plaintiffs have alleged injury in fact sufficient to support standing to ask the federal courts to consider their claim.

On appeal, defendants urge that, even if plaintiffs have established that they suffered injury in fact, plaintiffs still lack standing because it is unlikely their injury will be redressed by a favorable decision. Defendants argue that, because any party can institute a civil complaint and because criminal prosecution cannot occur until the civil complaint is resolved, enjoining the attorney general and the county attorneys will not redress plaintiffs' concerns about the chilling effects of the civil portion of the statute. However, a party "satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." Minn. Citizens Concerned for Life v. FEC, 113 F.3d 129, 131 (8th Cir. 1997) (emphasis in original) (internal quotation omitted). When a statute is challenged as unconstitutional, the proper defendants are the officials whose role it is to administer and enforce the statute. Mangual, 317 F.3d at 57. The county attorneys are the parties primarily responsible for enforcing the criminal portion of the statute; enjoining them would redress a discrete portion of plaintiffs' alleged injury in fact. Further, the county attorneys and the attorney general are also authorized–along with any other individual or organization–to institute a civil complaint. Granting declaratory or injunctive relief against the defendants, would redress a discrete injury to plaintiffs. Thus, we find plaintiffs have standing.

### b. Ripeness

Defendants also argue, as the district court held, that plaintiffs' claim is not justiciable because it is not ripe for adjudication. A claim is not ripe if the alleged injury "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." KCCP Trust v. City of North Kansas City, 432 F.3d 897, 899 (8th Cir. 2005) (quotation omitted). Here, defendants' ripeness challenge fails because plaintiffs' alleged injury has already occurred and will continue to occur at defined points. Plaintiffs' alleged injury is not based on speculation about a particular future prosecution or the defeat of a particular ballot question. Rather, the injury is speech that has already been chilled and speech that will be chilled each time a school funding initiative is on the ballot because of the very existence of section 211.B06. See Initiative & Referendum Inst. v. Walker, 450 F.3d 1082, 1098 (10th Cir. 2006) (plaintiffs' claim was ripe where plaintiff alleged the requirement "by its very existence, chills the exercise of the Plaintiffs' First Amendment rights"); see also Minn. Citizens Concerned for Life, 113 F.3d at 132. Here, the issue presented requires no further factual development, is largely a legal question, and chills allegedly protected First Amendment expression. Thus, we conclude that plaintiffs' claim is ripe for review.

### c. Sovereign Immunity

On appeal, defendant Lori Swanson–the Minnesota Attorney General–argues that there is an additional and independent reason plaintiffs' claims against her are not justiciable: she argues the Eleventh Amendment bars plaintiffs from bringing this suit against her in her official capacity. We find that the suit is proper under the Ex Parte Young, 209 U.S. 123 (1908), exception to Eleventh Amendment immunity and reject Swanson's argument.

The Eleventh Amendment establishes a general prohibition of suits in federal court by a citizen of a state against his state or an officer or agency of that state. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984). However, there are exceptions to this rule. Relevant here, a suit against a state official may go forward in the limited circumstances identified by the Supreme Court in Ex Parte Young. Under the Ex Parte Young doctrine, a private party can sue a state officer in his official capacity to enjoin a prospective action that would violate federal law. In determining whether this exception applies, a court conducts "a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland, 535 U.S. 635, 645 (2002) (alteration in original) (internal quotation omitted). Here, there is no dispute that the relief plaintiffs seek is prospective. The only question is whether they have alleged that defendant Swanson is, herself, engaged in an ongoing violation of federal law.

Plaintiffs argue that the attorney general is engaged in an ongoing violation of federal law by virtue of the office's participation in the enforcement mechanism of section 211.B06. Swanson responds that her office has no special role in the enforcement of section 211.B06 and that a state attorney general is not automatically a proper defendant when a lawsuit challenges the constitutionality of a state statute. Swanson is correct that, under Ex Parte Young, a state attorney general cannot be sued merely as a representative of the state itself. 209 U.S. at 157. Rather, to be amenable for suit challenging a particular statute the attorney general must have "some connection with the enforcement of the act." Reprod. Health Servs. v. Nixon, 428 F.3d 1139, 1145-46 (8th Cir. 2005). Here, plaintiffs have demonstrated a sufficient connection between the attorney general and the enforcement of section 211.B06 to satisfy this standard.

Plaintiffs allege a three-fold connection between the Minnesota attorney general and the enforcement of section 211.B06. First, the attorney general may, upon request

-14-

of the county attorney assigned to a case, become involved in a criminal prosecution of section 211.B06. Minn. Stat. § 8.01. Second, the attorney general is responsible for defending the decisions of the OAH–including decisions pursuant to section 211.B06–if they are challenged in civil court. See Minn. Stat. § 8.06 (the attorney general "shall act as the attorney for all state officers and all boards or commissions created by law in all matters pertaining to their official duties."). Third, the attorney general appears to have the ability to file a civil complaint under section 211.B06, as Minnesota law gives the attorney general broad discretion to commence civil actions, see Minn. Stat. § 8.01, and section 211B.06 allows any person, entity, or agency to file a civil complaint.

Under our precedent, this connection is strong enough to bring this suit under the Ex Parte Young exception to Eleventh Amendment immunity. While we do require "some connection" between the attorney general and the challenged statute, that connection does not need to be primary authority to enforce the challenged law. See Missouri Pro. & Advocacy Servs. v. Carnahan, 499 F.3d 803 (8th Cir. 2007) (finding the Ex Parte Young exception applied to attorney general where he could potentially have represented the state in a criminal prosecution that might have arisen indirectly out of an individual's failure to comply with the challenged voter-eligibility law). Nor does the attorney general need to have the full power to redress a plaintiff's injury in order to have "some connection" with the challenged law. Citizens for Equal Prot. v. Bruning, 455 F.3d 859, 864 (8th Cir. 2006). In Reproductive Health Services, 428 F.3d at 1145-46, we found that a connection, more tenuous than the one here, was sufficient to make the attorney general amenable to suit under Ex Parte Young. In Reproductive Health Services, as here, the attorney general had no authority to initiate criminal prosecution. Id. Rather, the attorney general could only participate in a criminal proceeding if his assistance was requested by the assigned county attorney or the trial court asked him to sign indictments. Id. Further, in Reproductive Health Services, the attorney general did not have the connection to the civil enforcement of the statute that is present here. Nonetheless, there we held that–although the

connection was not strong enough to support the issuance of a preliminary injunction against the attorney general–it *was* strong enough to bring the attorney general into the Ex Parte Young exception and make him a potentially proper defendant. Id. In the instant case, the three-fold connection plaintiffs have alleged is sufficient to make Swanson amenable to suit under the Ex Parte Young exception to Eleventh Amendment immunity.

### B. Failure to State a Claim

Because we find that the district court erred when it dismissed plaintiffs' complaint for lack of a subject-matter jurisdiction, we consider the court's alternate ground for dismissal: that plaintiffs failed to state a claim upon which relief can be granted. We review de novo a district court's dismissal of a complaint under Federal Rule of Civil Procedure Rule 12(b)(6) for failing to state claim. Smith v. St. Bernards Reg'l Med. Ctr., 19 F.3d 1254, 1255 (8th Cir. 1994).

The district court concluded that the kind of speech regulated by section 211B.06 falls outside the protections of the First Amendment and, thus, the district court upheld section 211B.06 without conducting a strict-scrutiny analysis. We conclude this approach was erroneous and remand the case to allow the district court to determine whether section 211B.06 is narrowly tailored to serve a compelling interest of the State of Minnesota.

As a general rule, content-based speech restrictions can only stand if they meet the demands of strict scrutiny. United States v. Playboy Entm't Group, Inc., 529 U.S. 803, 813 (2000). However, there is an exception to this rule for "certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem." Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72 (1942). The categories of speech that the Supreme Court has found fall outside the First Amendment include fighting words, obscenity,

child pornography, and defamation; statutes restricting speech from one of these categories are not subject to strict scrutiny as long as they are viewpoint-neutral. R.A.V. v. City of St. Paul, 505 U.S. 377, 382-88 (1992). The district court concluded that knowingly false speech is another category in this group of exceptions. We disagree. We find that the Supreme Court has never placed knowingly false campaign speech categorically outside the protection of the First Amendment and we will not do so today.

The district court relied on, and defendants cite to, language from the Supreme Court to support their conclusion that knowingly false speech is valueless and categorically exempt from First Amendment protection. See, e.g., Garrison v. Louisiana, 379 U.S. 64, 75 (1964). However, all the language the district court and defendants cited comes from cases dealing with otherwise unprotected speech, namely fraudulent or defamatory speech. We follow the lead of the Ninth Circuit in concluding that this language dismissing the value of knowingly false speech, when read in context of the opinions, does not settle the question here today. United States v. Alvarez, 617 F.3d 1198, 1200 (9th Cir. 2010) (striking down the Stolen Valor Act, which made it a crime to make a false statement about one's own military service); see also State Pub. Disclosure Comm'n v. 119 Vote No! Comm., 135 Wash. 2d 618 (1998) (striking down a statute that prohibited knowingly false speech about ballot issues).

The district court assumed, and defendants argue,[2] that the categorical exemption of defamatory speech is actually an exemption of all knowingly false speech. However, defamation-law principles are justified not only by the falsity of the speech, but also by the important private interests implicated by defamatory speech. See Charles Fried, The New First Amendment Jurisprudence: A Threat to Liberty, 59 U. Chi. L. Rev. 225, 238 (1992) (noting defamation is an actionable wrong because it "vindicate[s] private rights invoked by, or at least on behalf of, private individuals," but that "the First Amendment precludes punishment for generalized 'public' frauds, deceptions, and defamation"); Hustler Magazine v. Falwell, 485 U.S. 46, 52 (1988) (noting defamatory falsehoods are punishable because they can "cause damage to an individual's reputation that cannot easily be repaired by counterspeech, however persuasive or effective"). The importance of private interests to the foundations of defamation-law principles prevents us from assuming its applicability to knowingly false political speech. A government entity cannot bring a libel or defamation action. New York Times v. Sullivan, 376 U.S. 254, 291 (1964) (noting no court "of last resort in this country has ever held, or even suggested, that prosecutions for libel on government have any place in the American system of jurisprudence" (internal quotations omitted)). A ballot initiative clearly cannot be the victim of a character assassination. See McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 352 n.16 (1995). Although defendants are correct that some language from the defamation cases could, on its face, be read broadly enough to include non-defamatory false speech, "we are not eager to extend a statement (often quoted, but often qualified) made in the

_____

[2]To the extent that defendants also argue in favor of application of fraud principles to all knowingly false speech, we reject the argument, noting the Supreme Court has carefully limited the boundaries of what is considered fraudulent speech. It has not included all false speech, or even all knowingly false speech. See, e.g., Illinois ex rel. Madigan v. Telemarketing Assocs., Inc., 538 U.S. 600, 620 (2003) (noting that "[e]xacting proof requirements" of state law fraud claims, including requirements that "the defendant made the representation with the intent to mislead the listener, and succeeded in doing so," rendered the law constitutional since it "provided sufficient breathing room for protected speech").

complicated area of defamation jurisprudence into a new context in order to justify an unprecedented and vast exception to First Amendment guarantees." Alvarez, 617 F.3d at 1208.

After finding that Supreme Court precedent does not currently recognize knowingly false speech as a category of unprotected speech, we also decline to, ourselves, establish it as such. Although defendants may be correct that knowingly false speech is, itself, often valueless, the First Amendment does not allow the courts of appeals to decide whether a category of speech, on the whole, tends to contain socially worthless information. See United States v. Stevens, 130 S. Ct. 1577, 1585 (2010) ("The First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits."). The Court recently labeled the government's advocacy of such an approach "startling and dangerous." Id. Prior decisions that have discussed the worthlessness of speech categorically excepted from the First Amendment are descriptive not prescriptive–they tell us something about the speech that is exempt but not about what other types of speech may be exempt from First Amendment scrutiny. Thus, even if we were convinced that knowingly false speech was generally valueless, we could not on that basis make a judgment that it falls outside the protections of the First Amendment because "[t]he First Amendment itself reflects a judgement by the American people that the benefits of its restrictions on the Government outweigh the costs." Id.

We are especially unwilling to do so here because the speech involved (i.e., speech about ballot initiatives) is quintessential political speech, which is at the heart of the protections of the First Amendment.[3] Mills v. Alabama, 384 U.S. 214, 218

---

[3]The breadth of the protection afforded to political speech under the First Amendment is difficult to overstate in light of recent Supreme Court precedent. See Snyder v. Phelps, 131 S. Ct. 1207 (2011); Citizens United v. FEC, 130 S. Ct. 876 (2010). In Citizens United, the Court struck down a ban on political-campaign contributions by corporations, repeatedly emphasizing the special status of political

(1966) ("Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs.").  This law puts the Minnesota state government in the unseemly position of being the arbiter of truth about political speech.  This raises special First Amendment concerns because the First Amendment is not only about protecting the rights of individual speakers, but also about "constraining the collective authority of temporary political majorities to exercise their power by determining for everyone what is true and false, as well as what is right and wrong." Stephen G. Gey, The First Amendment and the Dissemination of Socially Worthless Untruths, 36 Fla. St. U. L. Rev. 1, 3 (2008).

We agree with the Ninth Circuit that, "given our historical skepticism of permitting the government to police the line between truth and falsity, and between valuable speech and drivel, we presumptively protect all speech, including false statements, in order that clearly protected speech may flower in the shelter of the First Amendment." Alvarez, 617 F.3d at 1217.  We do not, of course, hold today that a state

---

speech under the First Amendment.  130 S. Ct. at 898 ("[P]olitical speech must prevail against laws that would suppress it, whether by design or inadvertence.").  Although the Court concluded that the application of strict scrutiny was sufficient to protect the speech in that case, the Citizens United Court went so far as to suggest that there may be a bright-line rule against restrictions on political speech.  Id. ("[I]t might be maintained that political speech simply cannot be banned or restricted as a categorical matter.").  The Court's recent decision in Snyder is similarly protective of political speech.  Although it involved a challenge to a  tort verdict rather than to a speech-restricting statute, Snyder is, nonetheless, notable because the Court's decision to overturn the verdict against defendants hinged largely on the fact that the speech defendants were held liable for was speech about matters of public concern, which the Court noted is the "'essence of self-government.'"  131 S. Ct. at 1215 (quoting Garrison v. Louisiana, 379 U.S. 64, 74-75 (1964)).  This status was enough to entitle defendants' speech to special protection and insulate it from liability, despite the fact that the speech  was "hurtful" and its contribution to society "may be negligible." Id. at 1220.

may never regulate false speech in this context. Rather, we hold that it may only do so when it satisfies the First Amendment test required for content-based speech restrictions: that any regulation be narrowly tailored to meet a compelling government interest.

Defendants also invoke the negative implications of dicta from two Supreme Court cases striking down election laws on First Amendment grounds. See Brown v. Hartlage, 456 U.S. 45, 61-62 (1982) (holding that an election law prohibiting all false statements of fact was "inconsistent with the atmosphere of robust political debate protected by the First Amendment," and noting that the politician whose victory was nullified promptly retracted the false statement and apparently made the statement "in good faith and without knowledge of its falsity" or without "reckless disregard as to whether it was false or not"); McIntyre, 514 U.S. at 349 (holding that a ban on anonymous campaign pamphleteering violated the First Amendment, and noting that the state interest in preventing electoral fraud was less compelling because Ohio law already included "prohibitions against making or disseminating false statements during political campaigns" that applied to issue-driven ballot measures). While these cases may inform the district court's strict-scrutiny analysis, neither holds that the actual malice standard applies to false speech in the context of political campaigns on a ballot issue, and neither goes so far as to categorically exempt prohibitions on knowingly false campaign speech from any scrutiny under the First Amendment–which would be necessary for a motion to dismiss to be granted in this case.

## C.    Plaintiffs' Motion for Summary Judgment

After granting the defendants' motion to dismiss, the district court denied plaintiffs' motion for summary judgment, finding that it was moot. Because we reverse the dismissal of plaintiffs' complaint, we also vacate this finding of mootness. On appeal, plaintiffs urge us to grant their motion for summary judgment. However, additional development of arguments regarding whether section 211.B06 satisfies strict

scrutiny is required. Thus, we decline to consider the merits of plaintiffs' motion and, instead, remand the matter to the district court for reconsideration.

## III.  CONCLUSION

For the foregoing reasons, we reverse the district court's grant of defendants' motion to dismiss, vacate the denial of plaintiffs' motion for summary judgment, and remand to the district court for further proceedings consistent with this opinion.

_____