# United States Court of Appeals

## For the Eighth Circuit

_____

No. 19-2260

_____

Peggy Jones

*Plaintiff - Appellee*

v.

Larry Jegley, Prosecuting Attorney for Pulaski County, In His Official Capacity;
Sybal Jordan Hampton, In Her Official Capacity as a Member of the Arkansas
Ethics Commission; Tony Juneau, In His Official Capacity as a Member of the
Arkansas Ethics Commission; Ashley Driver Younger, In Her Official Capacity as
a Member of the Arkansas Ethics Commission; Alice L. Eastwood, In Her Official
Capacity as a Member of the Arkansas Ethics Commission; Lori Klein, In Her
Official Capacity as a Member of the Arkansas Ethics Commission

*Defendants - Appellants*

------------------------------

Institute for Free Speech

*Amicus on Behalf of Appellee(s)*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: September 26, 2019
Filed: January 27, 2020

_____

Before KELLY, MELLOY, and STRAS, Circuit Judges.

_____

STRAS, Circuit Judge.

Peggy Jones wishes to donate to candidates running for state office in Arkansas's 2022 election. Arkansas law prohibits her from doing so until two years before election day. Jones claims that this "blackout period" violates her First Amendment rights. The district court[1] concluded that she is likely to win and granted a preliminary injunction. We affirm.

I.

In Arkansas, individuals may donate up to $2,700 to a candidate for public office for the primary election and then donate up to the same amount once again for the general election. Ark. Code § 7-6-203(b)(1); *see id.* § 7-6-201(7) (providing that a primary election and a general election "each constitute[s] a separate election"). But there is a catch: candidates can only accept contributions within two years of an election. *Id.* § 7-6-203(e). If money changes hands during a "blackout period," Arkansas has been clear that both the donor and the candidate who received the contribution can be prosecuted. Brief of Appellants at 1; *see* Ark. Code § 7-6-202.

Jones is a "longtime political activist" who has frequently donated to political campaigns in Arkansas. She wants to donate now to candidates who have expressed a willingness to run in 2022. But her fear of prosecution, at least according to her complaint, has stopped her in her tracks. Hoping to clear the path, however, she has filed a lawsuit challenging the blackout period and has named

_____

[1]The Honorable James M. Moody, Jr., United States District Judge for the Eastern District of Arkansas.

Pulaski County Prosecutor Larry Jegley and the Commissioners of the Arkansas Ethics Commission (collectively, "Arkansas") as the defendants.[2]    After concluding that Jones was likely to win on the merits, the district court granted her request for a preliminary injunction.  Arkansas asks us to vacate the injunction on appeal.  *See* 28 U.S.C. § 1292(a)(1).

## II.

Our starting point is jurisdiction, and specifically whether Jones has established standing to sue.  Standing has three requirements: (1) an injury in fact; (2) a causal connection between the injury and the challenged law; and (3) a likelihood that a favorable decision will redress the injury.  *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 749 (8th Cir. 2019) (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)).  The dispute is over the first one: whether Jones has suffered an injury in fact.

At this stage, we assume that the allegations in the complaint are true and view them in the light most favorable to Jones.  *See Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 689 (8th Cir. 2003); *see also Lujan v. Def. of Wildlife*, 504 U.S. 555, 561 (1992) (explaining that "each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation").  Under this standard, Jones must have alleged in her complaint, at a minimum, that she has "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute,

---

[2]The Commissioners argue that they never should have been sued and that we must now dismiss them from the lawsuit.  We disagree.  Because the Arkansas Ethics Commission investigates campaign-finance violations, levies fines against candidates, and makes referrals to law enforcement, Ark. Code § 7-6-218(b), the Commissioners have a "strong enough" connection to the challenged law to make them "proper defendant[s]." *281 Care Comm. v. Arneson*, 638 F.3d 621, 632–33 (8th Cir. 2011) (applying *Ex parte Young*, 209 U.S. 123 (1908)).

and . . . a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (citation omitted) (explaining how to establish an injury in fact in a pre-enforcement constitutional challenge); *see also 281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011) (stating that "[s]elf-censorship can . . . constitute [an] injury in fact" for a free-speech claim when a plaintiff reasonably decides "to chill [her] speech in light of the challenged statute").

Jones's complaint clears this hurdle. In it, she alleges that she would donate to candidates running in the 2022 election if it were not illegal to do so. This general expression of intent is enough. *See Ark. Right to Life State Political Action Comm. v. Butler*, 146 F.3d 558, 560 (8th Cir. 1998); *see also Constitution Party of S.D. v. Nelson*, 639 F.3d 417, 420 (8th Cir. 2011) (concluding that "'general factual allegations of injury resulting from the defendant's conduct' will suffice to establish Article III standing at the pleading stage" (quoting *Lujan*, 504 U.S. at 561)).

She did not stop there. Once Arkansas began to question whether she had standing, she filed an affidavit expressing her desire to donate to Arkansas State Senator Mark Johnson. The affidavit stated that she has donated to Johnson before and wishes to make another contribution in advance of the 2022 election. *See Davis v. Anthony, Inc.*, 886 F.3d 674, 677 (8th Cir. 2018) (noting the "wide discretion" of trial courts to consider affidavits and other evidence of "disputed jurisdictional facts" at the pleading stage (citation omitted)). Together, the allegations in Jones's complaint and the affidavit leave us with no doubt that she has done enough at this stage to establish an intended "course of conduct arguably affected with a constitutional interest." *Susan B. Anthony List*, 573 U.S. at 159 (citation omitted).

Jones has also adequately alleged a credible threat of prosecution. Arkansas insists that donors who make contributions during a blackout period, as Jones

wants to do, can be prosecuted for "knowingly fail[ing] to comply" with campaign-finance laws. Ark. Code § 7-6-202. Nevertheless, Arkansas argues that any threat of prosecution at this point is not "credible" because Jones has not actually violated the statute. We have repeatedly rejected the argument that a plaintiff must risk prosecution before challenging a statute under the First Amendment, and we do so again here. *See, e.g.*, *Telescope Media Grp.*, 936 F.3d at 749; *281 Care Comm.*, 638 F.3d at 627; *St. Paul Area Chamber of Commerce v. Gaertner*, 439 F.3d 481, 485 (8th Cir. 2006); *Ark. Right to Life*, 146 F.3d at 560. As we explained in *281 Care Committee*, as long as there is no "evidence—via official policy or a long history of disuse—that authorities" have "actually" refused to enforce a statute, a plaintiff's fear of prosecution for illegal activity is objectively reasonable. 638 F.3d at 628.

Arkansas also argues that there is no credible threat of prosecution because Senator Johnson has not yet become a "candidate" under Arkansas law. Ark. Code § 7-6-201(2). To be sure, Senator Johnson has not, as Arkansas points out, "publicly announced" that he is running for reelection. But no public announcement is necessary. Rather, anyone who "has knowingly and willingly taken affirmative action, including solicitation of funds, for the purpose of seeking nomination for or election to any public office" is a "[c]andidate." *Id.*

Here, Johnson has already "knowingly and willingly" taken at least one "affirmative action": he allegedly told Jones that he was running in 2022. He has not yet solicited or accepted contributions for his reelection bid, but the reason is clear: any attempt to do so would expose him to criminal liability for violating the blackout period. Under these circumstances, Jones has established, at least at this stage, that if she were to donate to Senator Johnson now, the threat of prosecution would be credible.

III.

Having dealt with standing, our next task is to address whether Jones was entitled to a preliminary injunction. When deciding whether to grant one, the district court had to consider four equitable factors: whether Jones "[was] likely to succeed on the merits, [whether s]he [was] likely to suffer irreparable harm in the absence of preliminary relief, [whether] the balance of equities tip[ped] in h[er] favor, and [whether] an injunction [was] in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018) (per curiam); *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). Only the conclusion that Jones is likely to succeed on the merits—generally the most important factor in First Amendment cases—is contested here. *See Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) (explaining that, in a First Amendment case, likelihood of success on the merits is "often the determining factor in whether a preliminary injunction should issue"), *overruled on other grounds by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012) (en banc).

A.

The district court was right that, at this early stage of the litigation, Jones is likely to succeed on the merits. "[T]he First Amendment safeguards an individual's right to participate in the public debate through political expression and political association. When an individual contributes money to a candidate, [s]he exercises both of those rights . . . ." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 203 (2014) (plurality opinion) (internal citation omitted). Because of the constitutional rights involved, any attempt to restrict political contributions must withstand exacting scrutiny. Under this standard, the state bears the burden of establishing that the restriction "advance[s] a sufficiently important state interest and employ[s] means closely drawn to avoid unnecessary abridgement of First

Amendment freedoms." *Free & Fair Election Fund v. Mo. Ethics Comm'n*, 903 F.3d 759, 763 (8th Cir. 2018).

Arkansas asserts that the blackout period's purpose is to prevent corruption or its appearance. There is no doubt that, in the abstract, this is a sufficiently important state interest. *See Minn. Citizens Concerned for Life, Inc. v. Kelley*, 427 F.3d 1106, 1112 (8th Cir. 2005) (noting the "significant state interest" in "[a]voiding the appearance or perception of corruption"). But Arkansas "may target only a specific type of corruption—'*quid pro quo*' corruption," *McCutcheon*, 572 U.S. at 207 (plurality opinion), and even then only if blackout-period contributions pose a "substantial risk" of it. *Free & Fair Election Fund*, 903 F.3d at 764.

Arkansas has not shown that contributions made more than two years before an election present a greater risk of actual or apparent quid pro quo corruption than those made later. In fact, at the preliminary-injunction hearing before the district court, Arkansas admitted that it was "unaware of *any* . . . evidence" tying earlier contributions to the state's anti-corruption interest. (Emphasis added). Arkansas has given us no reason to believe that it will have anything more to offer at trial either. *See Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 (2000) (stating that "mere conjecture" is never "adequate to carry a First Amendment burden").

We do not write on a blank slate here. In *McCutcheon*, the Supreme Court told us what type of evidence to expect when applying exacting scrutiny. In addressing the constitutionality of aggregate contribution limits—which capped the total amount that each donor could give to all candidates in a single election cycle—the Court said that there must be proof that they accomplish something more than base limits alone. *See McCutcheon*, 572 U.S. at 210 (plurality opinion); *see also Holmes v. Fed. Election Comm'n*, 875 F.3d 1153, 1161 (D.C. Cir. 2017) (en banc) (explaining that, after *McCutcheon*, "an additional constraint layered on top of the base limits . . . separately need[s] to serve the interest in preventing the

appearance or actuality of corruption" (internal citation and quotation marks omitted)). In the absence of such proof, the Court held, the statute violated the First Amendment.[3] *See McCutcheon*, 572 U.S. at 227 (plurality opinion). Just as in *McCutcheon*, Arkansas's failure here to provide any evidence that its blackout period accomplishes anything more than the $2,700 base limits alone means that it cannot survive exacting scrutiny. *See id.* at 210 ("If there is no corruption concern in giving nine candidates up to $5,200 each, it is difficult to understand how a tenth candidate can be regarded as corruptible if given $1,801, and all others corruptible if given a dime."); *see also Zimmerman v. City of Austin*, 881 F.3d 378, 392 (5th Cir. 2018) (holding that a restriction on the timing of contributions "must be justified by evidence that the additional limit serves a distinct interest in preventing corruption that is not already served by the base limit").

Arkansas would have us reach the opposite conclusion based on three other decisions, none of which are binding or helpful. One decision, *O'Toole v. O'Connor*, 802 F.3d 783, 789–91 (6th Cir. 2015), upheld a restriction limiting the timing of individual donations to *judicial* campaign committees. *O'Toole* is not on point, however, because "a State's interest in preserving public confidence in the integrity of its judiciary extends beyond its interest in preventing the appearance of corruption in legislative and executive elections." *Williams-Yulee v. Fla. Bar*, 135

---

[3]Arkansas argues that we should not treat the plurality opinion in *McCutcheon* as binding, because Chief Justice Roberts wrote on behalf of only four members of the Court, with Justice Thomas concurring in the judgment. This is not how the Supreme Court has instructed us to read its opinions. Rather, when "no single rationale explaining the result enjoys the assent of five Justices," the holding of the Court is the "position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (citation omitted). Because Chief Justice Roberts's plurality opinion is the narrowest in support of the judgment, it is binding. *See Holmes*, 875 F.3d at 1157 (applying *Marks* and concluding that the *McCutcheon* plurality opinion is controlling); *cf. Thompson v. Hebdon*, 140 S. Ct. 348 (2019) (per curiam) (vacating and remanding a campaign-finance decision because of the failure to apply the plurality opinion from *Randall v. Sorrell*, 548 U.S. 230 (2006)).

S. Ct. 1656, 1667 (2015). In other words, the Supreme Court has been clear that different rules apply to judicial elections. *See id.* (explaining that its "precedents applying the First Amendment to political elections have little bearing on" judicial elections).

The other two decisions are even less helpful because they predate *McCutcheon*. *See N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 715–17 (4th Cir. 1999); *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1121–24 (9th Cir. 2011), *overruled in part on other grounds by Bd. of Trs. of the Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195 (9th Cir. 2019) (en banc). And, in any event, neither excuses Arkansas from its obligation to show how the blackout period advances its anti-corruption interest.

## B.

Perhaps aware that a lack of evidence may doom its argument that the blackout period independently furthers its anti-corruption interest, Arkansas advances an alternate rationale. It claims that prohibiting donors from making contributions more than two years before an election ensures compliance with other anti-corruption measures. Scrutinizing this "prophylaxis-upon-prophylaxis approach" closely, we conclude that this rationale falls short too. *Id.* at 221 (requiring courts to be "particularly diligent in scrutinizing" these types of justifications).

Arkansas starts with the base limits, which it says would be placed in jeopardy if candidates could accept contributions from donors for multiple cycles at the same time. As with its principal anti-corruption rationale, however, Arkansas has provided no evidence that the blackout period prevents circumvention of its base limits. *See id.* at 217 (discussing the absence of evidence of "any real-world examples of circumvention"). Moreover, even if the two restrictions are indeed linked, the blackout period is still "poorly tailored." *Id.* at

218. If preventing circumvention is the goal, there are a number of more closely drawn alternatives, the most obvious of which would be prohibiting the solicitation and receipt of funds for future election cycles. Arkansas's chosen method of regulation, by contrast, which "indiscriminate[ly] ban[s] . . . all contributions" through what appears to be an arbitrary two-year cutoff, goes too far in light of the availability of other, closer-fitting alternatives. *Id.* at 220; *see Free & Fair Election Fund*, 903 F.3d at 765 (explaining that, to survive exacting scrutiny, "the fit between the interest served and the means selected need not be perfect, [but] it must be reasonable, with the means selected proportionate to the interest served").

Arkansas fares no better in trying to connect the blackout period to its post-election-contribution ban. *See* Ark. Code § 7-6-203(g)(5). Under Arkansas law, candidates are prohibited from accepting contributions after an election, except to retire campaign debt. *See id.* Arkansas is apparently worried that donors will use future campaign contributions as a way of offering post-election bribes to victorious candidates. But even aside from the lack of an evidentiary record on how the blackout period helps reduce this risk, there is an obvious problem with this explanation. Given that Arkansas law already bans candidates from using "campaign funds as personal income," *id.* § 7-6-203(f)(1), it is unclear what, if anything, the blackout period adds. *See McCutcheon*, 572 U.S. at 216 (plurality opinion) (dismissing scenarios that were "either illegal under current campaign finance laws or divorced from reality"). The bottom line is that the anti-circumvention, "prophylaxis-upon-prophylaxis" rationale does not get Arkansas past the finish line either. *Id.* at 221.

## IV.

We accordingly affirm the grant of a preliminary injunction to Jones and remand this case for further proceedings consistent with this opinion.

_____