**Padmapriya ASHOKKUMAR, Plaintiff,**

v.

**Sebastian ELBAUM, Professor at the University of Nebraska–Lincoln, et al., Defendants.**

**No. 4:12–CV–3067.**

United States District Court, D. Nebraska.

March 15, 2013.

---

Andrew D. Weeks, V. Gene Summerlin, Jr., Husch, Blackwell Law Firm, Lincoln, NE, for Plaintiff.

Andre R. Barry, Cline, Williams Law Firm, John C. Wiltse, University of Nebraska, David W. Watermeier, Morrow, Poppe Law Firm, Lincoln, Tara A. Stingley, Cline, Williams Law Firm, Omaha, NE, for Defendants.

## MEMORANDUM AND ORDER

JOHN M. GERRARD, District Judge.

This matter is before the Court on several motions filed by the defendants: Fed. R.Civ.P. 12(b)(3) motions for judgment on the pleadings filed by all defendants, and Fed.R.Civ.P. 56 motions for summary judgment also filed by three of those defendants.

The plaintiff was a student in a Ph.D. program at the University of Nebraska–Lincoln, and became involved in a dispute over alleged academic misconduct. Although she was exonerated, she had trouble finding a professor who was willing to work with her to continue the research she

had been conducting for her dissertation. The plaintiff sued these defendants, all current or former employees of the State of Nebraska, after her eventual discontinuation from the Ph.D. program. The plaintiff's claims for relief fall into three categories for analytical purposes: constitutional tort claims, brought pursuant to 42 U.S.C. § 1983; state-law tort claims for intentional and negligent infliction of emotional distress; and a state-law breach of contract claim. The defendants have been sued in both their individual and official capacities.

The plaintiff's allegations, if proven, demonstrate that the plaintiff has been treated unfairly by at least some of these defendants. But that does not necessarily mean that all of the defendants acted unlawfully or unconstitutionally—and even constitutional claims must be brought within the time required by law. Here, not all of the plaintiff's claims were timely, and they do not all state a claim for legal relief. The Court concludes that the plaintiff's case may proceed against one of these defendants, in his official capacity, for injunctive relief pursuant to *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). For various reasons, as explained below, the plaintiff's other claims will be dismissed.

## BACKGROUND

At the time the events giving rise to this case took place, the plaintiff, Padmapriya Ashokkumar, was a student at the University of Nebraska–Lincoln pursuing a Ph.D. in the Department of Computer Science and Engineering (the Department). Filing 1 at 2. Defendants Sebastian Elbaum, Scott Henninger, Lorin Hochstein, and Steve Goddard were Department profes-

sors.[1] Filing 1 at 2. Kimberly Andrews Espy was the Associate Vice Chancellor for Research and the Research Integrity Officer. Filing 1 at 3. And Prem Paul was the Vice Chancellor for Research and the Dean of Graduate Studies. Filing 1 at 3.

In order to obtain her Ph.D. in Computer Science, the plaintiff had to meet the Ph.D. admission requirements, be admitted to the program, complete 90 credit hours, pass a Ph.D. qualifying examination, pass a comprehensive examination, and prepare and defend a dissertation in an approved area of research. Filing 1 at 4. The program of study and general area of research for a student's dissertation must be approved by the student's supervisory committee. The dissertation is prepared under the guidance of the student's faculty advisor, and must also be approved by the student's reading committee (a subcommittee of the supervisory committee) and defended in an oral examination and presentation before the supervisory committee. Filing 1 at 4–5. To complete a Ph.D., a student must have a faculty advisor and supervisory committee. Filing 1 at 5.

From September 2002 to April 2006, Henninger was the plaintiff's advisor. Filing 1 at 5. The plaintiff's research topic was "Using Ontologies for Supporting the Use of Usability Design Patterns." Filing 1 at 5. But the plaintiff was unsatisfied with Henninger for a number of reasons: she alleges he was disorganized, unsuccessfully submitted papers for publication, missed deadlines for publication submissions, was unprofessional, and was generally unfocused on guiding the plaintiff toward completion of her dissertation. Filing 1 at 5. With the approval of the

---

1. This recitation of facts is based on the allegations of the plaintiff's complaint, for purposes of deciding the defendants' motions for judgment on the pleadings. *See Poehl v. Countrywide Home Loans, Inc.,* 528 F.3d 1093, 1096 (8th Cir.2008). Later, when discussing the motions for summary judgment, the Court will discuss the additional evidence submitted with respect to those motions.

Department chair, the plaintiff terminated her advisory relationship with Henninger. Filing 1 at 5.

Henninger was displeased, and tried to convince the plaintiff to reconsider. Filing 1 at 5–6. She declined. Filing 1 at 6. In July 2006, the plaintiff began an advisory relationship with Elbaum and Hochstein. Filing 1 at 6. Her research topic was "Using Ontologies for Software Testing Problems." Filing 1 at 6. But the plaintiff alleges that Henninger told her she could not undertake any research relating to the use of ontologies unless she agreed to make him her co-advisor and a member of her supervisory committee, because he believed he had an "exclusive claim" to any research relating to ontologies at the University. Filing 1 at 6. The plaintiff alleges that when she refused, Henninger threatened her, saying that it would be his " 'personal vendetta' " to " 'throw [her] out of the university[.]' " Filing 1 at 6.

The plaintiff spoke to her Department chair about Henninger's conduct. Filing 1 at 6. The Department chair conducted a meeting with, among others, Henninger, Hochstein, and Elbaum. Filing 1 at 7. At the meeting, it was apparently agreed that the plaintiff could continue to pursue her Ph.D. in her chosen area of research. Filing 1 at 7. She did so, and submitted a paper for publication that had been co-authored with Elbaum and Hochstein. Filing 1 at 7. Henninger also submitted a paper for publication that identified himself as the sole author, although it was (according to the plaintiff) substantially the same as a paper that had been drafted by Henninger and the plaintiff. Filing 1 at 7–8. Henninger complained about the plaintiff's paper with Elbaum and Hochstein, asserting that it infringed on "his" research area. Filing 1 at 8.

On April 4, 2007, the plaintiff initiated a formal charge of plagiarism against Henninger, by informing Espy of her allega-tions regarding Henninger's paper. Filing 1 at 9. On April 12, Henninger initiated a formal charge of plagiarism against the plaintiff, Elbaum, and Hochstein, claiming that their joint paper was based on his work. Filing 1 at 9. A University inquiry committee was responsible for reviewing the formal charges. Filing 1 at 9. During the inquiry committee's review, settlement proposals were made to the plaintiff, but she refused them, because they involved either making Henninger a co-advisor or adding him to her supervisory committee, or required her to dismiss her plagiarism charge. Filing 1 at 10. Paul decided to convene an investigation committee to review the charges against the plaintiff and Henninger. Filing 1 at 10. Paul dismissed Henninger's charge as against Elbaum and Hochstein. Filing 1 at 10.

The investigation committee gathered evidence and produced a draft report recommending that Henninger's charge against the plaintiff be dismissed. Filing 1 at 10–11. The report also noted that the members of the committee were " 'disturbed' " by the tendency of many interviewed faculty to blame the plaintiff for the investigation, not for plagiarism, " 'but instead for perceived intransigence during attempts to negotiate a settlement....' " Filing 1 at 11. The report found

> "ample evidence that some or most of the involved faculty allowed the discussion of intellectual property to become conflated with a dispute over the composition of [the plaintiff]'s supervisory committee. The interviews revealed a hierarchy in which the needs and rights of a graduate student were somehow less important than those of faculty members and in which the serious responsibility for graduate education was allowed to become subordinate to the resolution of a dispute between groups of faculty members."

Filing 1 at 11. And the report found the plaintiff's allegations against Henninger to be true. In July 2008, Paul, the University's deciding official, adopted the recommendations of the investigation committee. Filing 1 at 12.

But the plaintiff had been unable to continue her research work during the investigation. Filing 1 at 12. And even after the draft report cleared her, Elbaum refused to serve as her advisor, telling her that his refusal was based on her unwillingness to accept the settlement proposals that had been made to her. Filing 1 at 12. Hochstein told her that he would no longer serve as her advisor unless she changed her research topic, and in any event he left the University in May 2008 for another position. Filing 1 at 12.

The plaintiff told Espy that Elbaum and Hochstein had refused to work with her, and asked that she be allowed to finish her Ph.D. on her existing research topic. Filing 1 at 13. But Goddard, who was by then the Department chair, told the plaintiff that it was her responsibility to find another advisor. Filing 1 at 13. None of the Department faculty would agree to serve as her advisor on her existing research topic. Filing 1 at 13. The plaintiff alleges that Espy and Goddard did nothing to help her complete her research on her chosen topic. Filing 1 at 14. Henninger left the University in December 2008, and the plaintiff alleges that before he left, he influenced other faculty not to advise the plaintiff and to block her from receiving her Ph.D. on her existing research topic. Filing 1 at 14.

The plaintiff alleges that the University had a duty to protect her from retaliation based on the charge of academic misconduct made against her. Filing 1 at 14. Specifically, she alleges that according to the University misconduct policy, University officials were required to make "all reasonable and practical efforts" to restore her standing and position when the allegation of research misconduct against her proved unfounded. Filing 1 at 15. The plaintiff contends that they failed to do so, and that her pursuit of a Ph.D. was terminated as a result. Filing 1 at 17.

The plaintiff alleges several claims for relief arising from these facts. She claims to have been denied her rights to procedural and substantive due process. Filing 1 at 19–20. She claims to have been denied her right to free speech by the alleged retaliation against her for her charge of research misconduct against Henninger. Filing 1 at 20–21. And she alleges state-law claims for breach of contract, intentional infliction of emotional distress, and negligent infliction of emotional distress. Filing 1 at 21–23.

Espy, Elbaum, Goddard, Hochstein, and Paul have jointly filed a motion for judgment on the pleadings, asserting that the plaintiff's complaint fails to state a claim upon which relief can be granted. Filing 15. Henninger has filed his own motion for judgment on the pleadings, on the same grounds. Filing 21. Elbaum and Hochstein have also filed a motion for summary judgment based on a statute of limitations defense, and Henninger has filed a separate motion for summary judgment on the same basis. Filings 17 and 22.[2]

## ANALYSIS

The plaintiff's claims fall into three categories for analytical purposes: her constitutional tort claims, brought pursuant to 42 U.S.C. § 1983; her tort claims for emotional distress; and her breach of contract

---

**2.** Although Henninger has filed separate motions and briefs from the other defendants, he takes essentially the same legal positions, and the Court has generally considered the defendants' arguments together.

claim. As will be explained below, the plaintiff's tort claims against Elbaum, Hochstein, and Henninger are barred by the statute of limitations. It is, therefore, unnecessary for the Court to determine whether the plaintiff's tort claims against those defendants stated a claim for relief. So, the first issue presented is whether the plaintiff has stated a constitutional claim against Espy, Goddard, or Paul.

■ As a general rule, a Fed.R.Civ.P. 12(c) motion for judgment on the pleadings is reviewed under the same standard as a Fed.R.Civ.P. 12(b)(6) motion to dismiss. *Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1233 n. 3 (8th Cir.2010). A Rule 12(c) motion requires the Court to view all facts pleaded by the nonmoving party as true and grant all reasonable inferences in favor of that party. *Poehl*, 528 F.3d at 1096. Judgment on the pleadings is appropriate only when there is no dispute as to any material facts and the moving party is entitled to judgment as a matter of law. *Ashley Cty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir.2009); *Poehl*, 528 F.3d at 1096.

■ A complaint must set forth a short and plain statement of the claim showing that the pleader is entitled to relief. Fed.R.Civ.P. 8(a)(2). This standard does not require detailed factual allegations, but it demands more than an unadorned accusation. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The complaint need not contain detailed factual allegations, but must provide more than labels and conclusions; and a formulaic recitation of the elements of a cause of action will not suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). For the purposes of a motion to dismiss, a court must take all of the factual allegations in the complaint as true, but is not bound to accept as true a legal conclusion couched as a factual allegation. *Id.*

■ And to survive a motion to dismiss, a complaint must also contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *See Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief. *Id.*

Determining whether a complaint states a plausible claim for relief will require the reviewing court to draw on its judicial experience and common sense. *Id.* The facts alleged must raise a reasonable expectation that discovery will reveal evidence to substantiate the necessary elements of the plaintiff's claim. *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. The court must assume the truth of the plaintiff's factual allegations, and a well-pleaded complaint may proceed, even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely. *Id.*

### OFFICIAL CAPACITY CONSTITUTIONAL CLAIMS: *EX PARTE YOUNG*

■ The Eleventh Amendment establishes a general prohibition of suits in federal court by a citizen of a state against his state or an officer or agency of that state. *281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir.2011). However, there are exceptions to this rule. Relevant here, a suit against a state official may go forward in the limited circumstances identified by the Supreme Court in *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441. *Arneson*, 638 F.3d at 632. *Ex Parte Young* recognized that suits may be brought in federal court against state officials in their official ca-

pacities for prospective injunctive relief to prevent future violations of federal law. *Treleven v. Univ. of Minn.*, 73 F.3d 816, 819 (8th Cir.1996). In determining whether this exception applies, a court conducts a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective. *Arneson*, 638 F.3d at 632.

■■ The defendants do not contend that the relief sought is not prospective. Every circuit court to have considered the analogous question whether reinstatement to previous employment is "prospective" has concluded that it is, including the Eighth Circuit. *See Treleven*, 73 F.3d at 819; *see generally State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 96–98 (2d Cir.2007)(collecting cases). The Eleventh Amendment may bar a plaintiff from seeking retrospective relief against a state official in his or her official capacity, but it does not bar the court from examining the allegations to determine whether there is an ongoing violation of federal law. *Diaz v. Mich. Dep't of Corrs.*, 703 F.3d 956, 965 (6th Cir.2013). In sum, reinstatement is prospective relief, *see id.*, including in graduate school studies. *See, e.g., Hall v. Med. Coll. of Ohio at Toledo*, 742 F.2d 299, 310 (6th Cir.1984).

■ Whether the complaint alleges an ongoing violation of federal law is a more difficult question. But the Court finds that the plaintiff has stated a claim, at least at the pleading stage. Taken as true, the plaintiff's allegations support a theory that at least some members of the Department refused to work with her because of her charge of plagiarism against Henninger, and her refusal to settle that charge or the charge Henninger leveled against her. Specifically, the plaintiff alleges that Elbaum expressly refused to work with her because of her unwillingness to accept settlement, and the University investigation

committee also noted that "many" Department faculty members blamed the plaintiff for "perceived intransigence during attempts to negotiate a settlement." Filing 1 at 11–12. Those allegations suggest that the plaintiff may have been retaliated against because she chose to exercise her due process and First Amendment rights. And that would violate federal law.

■ It seems clear, to begin with, that the plaintiff had a right to due process in connection with the charge of plagiarism that was directed at her, even if it is not entirely clear, at this stage, what that constitutionally required process might have entailed. To satisfy the Fourteenth Amendment's requirement of procedural due process, while no hearing is required, a student who is dismissed for academic reasons from a public university must be afforded notice of faculty dissatisfaction and potential dismissal, and the dismissal decision must be careful and deliberate. *Richmond v. Fowlkes*, 228 F.3d 854, 857 (8th Cir.2000). This sets a difficult (but not impossible) standard for a plaintiff to satisfy. Where administrative matters are concerned, the Court must proceed on the assumption that administrators are entitled to a presumption of honesty and integrity unless actual bias, such as personal animosity, illegal prejudice, or a personal or financial stake in the outcome can be proven. *Id.* at 858.

■ But the procedural due process standard is somewhat different for disciplinary dismissal, as opposed to academic. The Supreme Court has noted the "significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct." *Bd. of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 86, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). As a result, the law distinguishes between academic and disciplinary dismissals, *Hlavacek v. Boyle*, 665 F.3d 823, 826 (7th Cir.

2011), and in disciplinary cases, a student must receive notice of the charges and evidence and an opportunity to be heard on them. *See, e.g., Willis v. Tex. Tech Univ. Health Scis. Ctr.,* 394 Fed.Appx. 86, 87 (5th Cir.2010); *Lucey v. Bd. of Regents of the Nev. Sys. of Higher Ed.,* 380 Fed. Appx. 608, 610 (9th Cir.2010); *Nash v. Auburn Univ.,* 812 F.2d 655, 663 (11th Cir.1987); *see generally Horowitz,* 435 U.S. at 87–89, 98 S.Ct. 948. This case involves what might be called "academic misconduct," which shares characteristics of both academic and disciplinary proceedings. Dismissals have been considered "academic" when the student's deficiencies, while arguably warranting disciplinary action, also bear on academic performance. *Monroe v. Ark. State Univ.,* 495 F.3d 591, 595 (8th Cir.2007). But while a charge of plagiarism is not unrelated to a student's satisfactory academic progress, the Court finds that it is sufficiently disciplinary in nature to warrant the somewhat more stringent due process requirements associated with a disciplinary proceeding. *See, e.g., Pugel v. Bd. of Trs. of the Univ. of Ill.,* 378 F.3d 659, 664 (7th Cir.2004)(charge of fabricated data and improper research presentation); *Than v. Univ. of Tx. Med. Sch. at Hous.,* 188 F.3d 633, 634–35 (5th Cir.1999)(charge of cheating on examination).[3]

Also relevant is the contractual relationship between the plaintiff and the University; the terms of that contract may be implied from a student handbook or other statements of academic policy. *Ikpeazu v. Univ. of Neb.,* 775 F.2d 250, 253 (8th Cir. 1985); *see also Disesa v. St. Louis Cmty. Coll.,* 79 F.3d 92, 95 (8th Cir.1996). In this case, the plaintiff has alleged the existence of a University misconduct policy that

could be held to create a cognizable property interest in nonarbitrary decisions with respect to allegations of research misconduct, and imply a contractual expectation in students that they will be protected from retaliation for making charges of misconduct, and restored to their academic standing should they be exonerated of charges against them. Filing 1 at 14–17. *See, Disesa,* 79 F.3d at 95; *Ikpeazu,* 775 F.2d at 253; *see also, Barnes v. Zaccari,* 669 F.3d 1295, 1304–05 (11th Cir.2012); *Bissessur v. Ind. Univ. Bd. of Trs.,* 581 F.3d 599, 601–02 (7th Cir.2009). This does not require the University to follow each and every one of its own internal procedures, because that would result in the constitutionalizing of every state rule. *Xu v. Mich. State Univ.,* 195 Fed.Appx. 452, 457 (6th Cir.2006); *see Schuler v. Univ. of Minn.,* 788 F.2d 510, 515–16 (8th Cir.1986). But it does mean that a student's right, as established by those procedures, cannot be taken away without a rational basis, or because of bad faith or ill will toward the student. *See, Richmond,* 228 F.3d at 859; *Schuler,* 788 F.2d at 516; *Ikpeazu,* 775 F.2d at 253. And the Court is not able to resolve those matters on the pleadings.

Of course, in this case, the plaintiff received most of any process that was due. And she does not contend otherwise. She was given notice and an opportunity to be heard at a fair hearing, and her claims were (as relevant to this proceeding) largely vindicated. But she alleges that despite that vindication, the defendants refused to fully implement the result of the hearing: that is, that she was informally punished anyway. And at least at this stage of the case, those allegations are sufficient. The Due Process Clause would be a dead letter if the outcome of a decision-making pro-

---

**3.** The defendants argue that the plaintiff asks the Court to impermissibly interfere in the legitimate academic functions of a university. But as noted, the Court views this case as involving allegations that are at least as disciplinary as they are academic. And even academic decisions are subject to at least some review, however deferential.

cess need not be given effect. And more to the point, the plaintiff has sufficiently alleged that she was retaliated against for exercising her due process rights, which itself states a constitutional violation.

 It is well settled that an act in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper. *Madewell v. Roberts*, 909 F.2d 1203, 1206 (8th Cir.1990). "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort, and for an agent of the State to pursue a course of conduct whose objective is to penalize a person's reliance on his legal rights is patently unconstitutional." *Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978) (citation and quotation omitted). This is true even if the government's actions did not independently violate the Constitution: government actions which standing alone do not violate the Constitution may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for the exercise of a constitutional right. *See, Vance v. Barrett*, 345 F.3d 1083, 1093 (9th Cir. 2003); *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir.2001); *Babcock v. White*, 102 F.3d 267, 275 (7th Cir.1996); *see also Sprouse v. Babcock*, 870 F.2d 450, 452 (8th Cir.1989).

 And as discussed above, the plaintiff's allegations are sufficient to suggest that some faculty members refused to work with the plaintiff because of the plaintiff's exercise of her right to due process in connection with the misconduct charge against her. The First Amendment is also implicated by the plaintiff's complaint against Henninger. The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right. *Shepard v. Irving*, 77 Fed.Appx. 615, 621 (4th Cir.2003). And the academic conduct (or misconduct) of a professor at a state university is an issue of public importance, rather than just private interest. *Feldman v. Ho*, 171 F.3d 494, 495 (7th Cir.1999); *see also Hulen v. Yates*, 322 F.3d 1229, 1237–38 (10th Cir.2003)(charges of plagiarism and copyright violation at a public university are plainly of interest to the public). The cross-charges made by the plaintiff and Henninger are fairly regarded as part of the same dispute, so the facts suggesting that the plaintiff was retaliated against for refusing to settle the charge against her also suggest that the plaintiff may have been retaliated against for prosecuting her charge against Henninger, by Henninger and others. And if so, then the plaintiff was retaliated against for engaging in speech protected by the First Amendment. *See, e.g., Shepard*, 77 Fed.Appx. at 621; *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir.1995).

 In sum, the plaintiff has alleged a colorable claim that she was retaliated against for exercising her constitutional rights, and that Espy and Goddard, at least, failed to shield her from that retaliation.[4] That states a claim for relief under § 1983—specifically, injunctive relief directing the responsible state officials to meaningfully restore the plaintiff's academic standing.[5] But the defendants

---

4. As will be explained below, the plaintiff's allegations are insufficient with respect to Paul.

5. The defendants question whether the plaintiff was actually terminated from the Ph.D. program. They also frame the issue as whether the plaintiff had a constitutional right to an advisor on the dissertation topic of her choice. Filing 16 at 19. The Court does not view those matters as dispositive—retaliation can assume a constitutional dimension even if it falls short of termination. *See, e.g., Rutan v. Republican Party*, 497 U.S. 62, 73–

question whether Espy, Goddard, and Paul are the right officials. They claim that neither Goddard nor Espy had the authority to compel a Department professor to advise the plaintiff.[6] Filing 16 at 18. And Espy is no longer employed at the University. Filing 16 at 27.

■ With respect to Espy, they have a point. The plaintiff does not allege that Espy has the authority to grant her injunctive relief, and there is no basis in the record to dispute the defendants' claim that Espy has moved to another university—in fact, the plaintiff alleges that Espy is currently a resident of Oregon. Filing 1 at 3. Therefore, any prospective injunctive relief as to Espy can be of no consequence to the plaintiff. See Randolph v. Rodgers, 253 F.3d 342, 345–46 (8th Cir.2001).[7] The plaintiff's allegations are also deficient as to Paul—there is nothing in the plaintiff's complaint that suggests Paul was informed of any retaliation against the plaintiff or asked to provide her with any relief, and the plaintiff similarly does not allege that Paul retains a position in which he could provide the plaintiff with relief. Whether Goddard is in a position to grant such relief, however, is a matter that should at least be explored through further discovery, given that Goddard is allegedly the current Department chair.[8] Ex Parte

Young does not require that a defendant have full power to redress a plaintiff's injury; rather, it simply requires that the defendant have "some connection" with the challenged actions. Arneson, 638 F.3d at 632–33. At least on the face of the plaintiff's complaint, Goddard meets that requirement. Similarly, whether there may have been legitimate academic reasons to refuse to advise the plaintiff, or to require her to abandon her previous research, is a matter that can be explored through further discovery.

■ Therefore, the Court will permit the plaintiff to proceed with her constitutional claims seeking injunctive relief from Goddard in his official capacity, and the defendants' motion for judgment on the pleadings will be denied to that extent. The plaintiff's constitutional claims against Espy and Paul, in their official capacities, will be dismissed, and the defendants' motion for judgment on the pleadings will be granted to that extent. And to the extent that the plaintiff's state-law claims were directed against any defendants in their official capacities, those claims will also be dismissed, as the exception to the Eleventh Amendment carved out by Ex Parte Young does not extend to lawsuits seeking

76, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). The appropriate question is whether the alleged retaliation would chill a person of "ordinary firmness" from engaging in the protected activity at which the retaliation was directed. Santiago v. Blair, 707 F.3d 984, 991–92 (8th Cir.2013). The facts alleged here satisfy that standard.

6. This may prove to be the case, but seems somewhat beside the point: if the plaintiff can prove that her constitutional rights are being violated by University professors, then surely someone at the University has the authority to tell them to stop.

7. The Court notes that Fed.R.Civ.P. 25(d), which provides for substitution of public offi-

cers, does not apply here because it applies only when the public officer leaves office "while the action is pending." Espy left her position before the plaintiff's complaint was filed, so the action was not "pending" against her when she left. See id.; see also Ford v. Dowd, 931 F.2d 1286, 1288 (8th Cir.1991); cf. Snyder v. Buck, 340 U.S. 15, 20, 71 S.Ct. 93, 95 L.Ed. 15 (1950).

8. The defendants also argue that Goddard did not retaliate against the plaintiff. But even if true, that is not dispositive: the real questions are whether Goddard was aware of any retaliation and failed to stop it, and whether Goddard is in an official position to provide the plaintiff with a remedy should a constitutional violation be proven.

to enjoin state officers from violating state law. *Treleven,* 73 F.3d at 819 n. 4.

### INDIVIDUAL CAPACITY CONSTITUTIONAL CLAIMS: QUALIFIED IMMUNITY

 In their individual capacities, Espy, Goddard, and Paul resist the plaintiff's constitutional claims based on the doctrine of qualified immunity. The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Messerschmidt v. Millender,* — U.S. —, 132 S.Ct. 1235, 1244, 182 L.Ed.2d 47 (2012); *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly, and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Pearson,* 555 U.S. at 231, 129 S.Ct. 808. In short, the plaintiff must plead facts showing that (1) the defendants violated a statutory or constitutional right, and (2) the right was clearly established at the time of the challenged conduct. *Ashcroft v. al-Kidd,* — U.S. —, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011). And the Court has discretion to decide which of the two prongs of qualified-immunity analysis to tackle first. *Id.*

 For these purposes, a government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that any reasonable official would have understood that what he is doing violates that right. *Ashcroft,* 131 S.Ct. at 2080. Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken. *Messerschmidt,* 132 S.Ct. at 1245; *Pearson,* 555 U.S. at 244, 129 S.Ct. 808. The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact. *Messerschmidt,* 132 S.Ct. at 1245. Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law. *Id.* at 1244; *see also Ashcroft,* 131 S.Ct. at 2085.

 In this case, the Court concludes that the contours of the plaintiff's constitutional rights were not so clearly established as to give Espy, Goddard, or Paul sufficient notice that there might be constitutional implications to the requirement that the plaintiff find her own academic advisor. The plaintiff had exercised the procedures available to her to resolve the charges of academic misconduct. It was not unreasonable for Espy, Goddard, or Paul to conclude that once those proceedings were complete (at least as to the plaintiff), the plaintiff would be subject to the same rules as any other student in the Ph.D. program, including the requirement that students were responsible for finding their own academic advisors.

 The plaintiff's allegations are particularly deficient as to Paul, as noted above—the complaint alleges that he convened the inquiry committee that looked into the misconduct allegations, and then adopted the recommendations of the investigation committee that effectively vindicated the plaintiff. There is nothing to suggest that Paul was informed of, or asked to remedy, any retaliation against the plaintiff. Simply put, Paul is not al-

leged to have done anything that could be characterized as wrongful, much less unlawful. (And much, much less in violation of clearly established law.) And the allegations against Goddard and Espy are limited to their alleged failure to prevent others in the Department from retaliating against the plaintiff. While the Court has found that the plaintiff's constitutional rights may potentially have been violated, that violation (if proved) was still not so clear as to show that Espy or Goddard were "plainly incompetent" in thinking they were not required to do more to help the plaintiff find an academic advisor willing to let her use her existing research. *See Messerschmidt*, 132 S.Ct. at 1244. " 'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.' " *Luckert v. Dodge County*, 684 F.3d 808, 817 (8th Cir.2012). Objectively reasonable officials in Goddard's and Espy's positions could have concluded that their actions (or omissions) were not unconstitutional. *See Kendrick v. Pope*, 671 F.3d 686, 690 (8th Cir.2012).

Therefore, the Court will grant the defendants' motion for judgment on the pleadings on the plaintiff's constitutional claims against Paul, Goddard, and Espy in their individual capacities, and those claims will be dismissed.

### CONTRACT CLAIM

■ The plaintiff's complaint also contains a state-law breach of contract claim, which relies on the implied contract contained in student handbooks or statements of academic policy. Filing 1 at 21–22. The defendants contend that the allegations are insufficient because there is no identification of a particular contract or how it was breached, and no allegation that the individual defendants were parties to the contract. Filing 16 at 21–23.

■ The Court agrees with the defendants that the plaintiff's allegations regarding the terms and breach of the alleged contract leave something to be desired. But the Court need not resolve that, because the defendants are clearly correct in pointing out that they were not, in their individual capacities, parties to any contract with the plaintiff. The plaintiff's agreement was with the University, and the defendants were merely employees or agents of the University. As a general rule, a court cannot enforce the obligation of a principal against an agent. *Oriental Trading Co. v. Firetti*, 236 F.3d 938, 944 (8th Cir.2001)(citing *Edwin Bender & Sons v. Ericson Livestock Comm'n Co., Inc.*, 228 Neb. 157, 421 N.W.2d 766, 771 (1988)). Simply put, because the defendants in their individual capacities were not parties to the contract between the plaintiff and the University, the plaintiff does not have a valid breach of contract claim against the defendants in their individual capacities. *Dover Elevator Co. v. Ark. State Univ.*, 64 F.3d 442, 447 (8th Cir.1995); *see also Oriental Trading Co.*, 236 F.3d at 944; *cf. Lis v. Moser Well Drilling & Serv., Inc.*, 221 Neb. 349, 377 N.W.2d 98, 100 (1985). And as noted above, the defendants in their official capacities are immune from suit based on state law claims in federal court. *Dover Elevator Co.*, 64 F.3d at 447; *see also Arneson*, 638 F.3d at 632. The plaintiff has identified no basis for finding that Nebraska has waived its Eleventh Amendment immunity in this regard. *Compare Doe v. Nebraska*, 345 F.3d 593 (8th Cir.2003).

■ The plaintiff also argues, in connection with her contract claim, that there may have been a fiduciary relationship between herself and at least some of the defendants. Under Nebraska law, a fiduciary duty arises out of a confidential relationship which exists when one party gains the confidence of the other and purports to act or advise with the other's

interest in mind. *Gonzalez v. Union Pac. R.R. Co.*, 282 Neb. 47, 803 N.W.2d 424, 446 (2011). But the plaintiff did not plead a claim of breach of fiduciary duty, and therefore has not alleged facts that would distinguish her relationship with the defendants as being more than an ordinary student-teacher relationship. And the plaintiff does not explain how any alleged fiduciary duty would establish a *contractual* relationship supporting the claim for relief that she has attempted to allege. Some (although not all) contracts can create fiduciary relationships, *see Am. Driver Serv., Inc. v. Truck Ins. Exch.*, 10 Neb. App. 318, 631 N.W.2d 140, 147–48 (2001), but the Court is aware of no authority suggesting that a fiduciary relationship can give rise to a contract.

Therefore, the Court will grant the defendants' motion for judgment on the pleadings as to the plaintiff's breach of contract claim, and will dismiss that claim in its entirety as to all defendants.

### EMOTIONAL DISTRESS CLAIMS

The plaintiff has also advanced state-law claims for intentional and negligent infliction of emotional distress. The Court considers these claims as to Goddard, Espy, and Paul, because as with the plaintiff's constitutional tort claims, the plaintiff's state-law tort claims against Elbaum, Henninger, and Hochstein are barred by the statute of limitations. The defendants argue that the plaintiff's emotional distress claims are defective because the plaintiff has not alleged any · instances of outrageous conduct, has not alleged a violent injury or bystander liability, and has not sufficiently alleged emotional distress. Filing 16 at 23–27. The Court agrees with the defendants.

█ To recover for intentional infliction of emotional distress under Nebraska law, a plaintiff must prove (1) intentional or reckless conduct (2) that was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community, and (3) that the conduct caused emotional distress so severe that no reasonable person should be expected to endure it. *Roth v. Wiese*, 271 Neb. 750, 716 N.W.2d 419, 431 (2006). Here, while the plaintiff has alleged intentional conduct, that conduct (particularly on the parts of Goddard, Espy, and Paul) was not atrocious or intolerable. *See id.* Nor has the plaintiff sufficiently alleged facts showing emotional distress so severe that no reasonable person should be expected to endure it. *See id.*

█ As noted above, while a complaint need not contain detailed factual allegations, it must provide more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not suffice. *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. Here, the plaintiff has provided precisely such a formulaic recitation. The plaintiff merely alleges that the defendants caused her "emotional distress so severe that no reasonable person should be expected to endure it" and that she "suffered medically diagnosed emotional anguish or mental harm of sufficient severity to be medically significant." Filing 1 at 22. But she does not allege *facts* supporting those elements: for instance, she has not alleged any medical symptoms, or anything to describe her emotional distress in terms beyond legal boilerplate. Federal courts have generally held such boilerplate allegations of emotional distress to be insufficient under federal pleading standards. *See, e.g., Ferretti v. Pfizer Inc.*, 855 F.Supp.2d 1017, 1029 (N.D.Cal.2012); *Travis v. JP Morgan Chase Bank, N.A.*, 2012 WL 3193341, *5 (N.D.W.Va. Aug. 6, 2012); *Lum v. Go Wireless, Inc.*, 2011 WL 6370590, *4 (D.Haw. Dec. 20, 2011); *Phil-*

*lips v. World Publ'g Co.*, 822 F.Supp.2d 1114, 1120 (W.D.Wash.2011).

■ The plaintiff's negligent infliction of emotional distress claim fails for similar reasons. Nebraska law has not recognized recovery for negligently inflicted emotional distress unless the plaintiff is (1) a direct victim of the defendant's negligence in the "zone of danger," i.e., threatened with physical injury or placed in fear for his or her own safety; or (2) a bystander with a marital or intimate familial relation to the direct victim of the defendant's negligence. *See Hamilton v. Nestor*, 265 Neb. 757, 659 N.W.2d 321, 327–28 (2003). The plaintiff has not alleged facts that can be read to fall within either theory. And as with her intentional infliction of emotional distress claim, she has not alleged facts supporting the necessary degree of emotional anguish or mental harm. *See id.* at 329.

Therefore, the Court finds that the plaintiff has not stated a claim for intentional or negligent emotional distress, and will dismiss those claims.

### STATUTE OF LIMITATIONS

As mentioned previously, defendants Elbaum, Henninger, and Hochstein have filed motions for summary judgment based on the statute of limitations. It is unnecessary to address the statute of limitations as to the plaintiff's breach of contract claim, as that claim has already been disposed of. Remaining are the plaintiff's tort claims.

■ Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Roch-*

*ester*, 643 F.3d 1031, 1042 (8th Cir.2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

■ On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir.2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791–92 (8th Cir.2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson, supra*, 643 F.3d at 1042.

■ The relevant statute of limitations for all of the plaintiff's tort claims is 4 years. *See,* Neb.Rev.Stat. § 25–207; *Montin v. Estate of Johnson*, 636 F.3d 409, 412–13 (8th Cir.2011). But the accrual date of a § 1983 claim is a question of federal law that is not resolved by reference to state law. *Wallace v. Kato*, 549 U.S. 384, 388, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007); *Montin*, 636 F.3d at 413. So, the Court must separately determine when

the plaintiff's constitutional claims and state-law tort claims accrued.

The Supreme Court has explained that aspects of § 1983 which are not governed by reference to state law are governed by federal rules conforming to common-law tort principles. *Wallace*, 549 U.S. at 388, 127 S.Ct. 1091. The standard rule is that accrual occurs when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief. *Id.* Under this rule, the tort cause of action accrues, and the statute of limitations commences to run, when the wrongful act or omission results in damages. *Id.* at 391, 127 S.Ct. 1091. The cause of action accrues even though the full extent of the injury is not then known or predictable. *Id.* Were it otherwise, the Court has explained, the statute would begin to run only after a plaintiff became satisfied that he or she had been harmed enough, placing the supposed statute of repose in the sole hands of the party seeking relief. *See id.*

The problem this rule presents for the plaintiff's claims against Elbaum, Henninger, and Hochstein is evident. She has not presented evidence that any of those defendants did anything wrongful within the 4 years before she filed her complaint. Henninger's last appearance was no later than June 2007, when the plaintiff alleges that he pressured Elbaum and Hochstein. Filing 44–1 at 4–5. Elbaum stepped away from advising the plaintiff on August 22, 2007. Filing 44–1 at 5. Hochstein informed the plaintiff he would no longer work with the plaintiff on her previously approved research topic no later than November 19, 2007. Filing 44–1 at 5–6. And she did not file this case until April 5, 2012. *See* filing 1.

The plaintiff contends that as of November 19, 2007, she "had no reason to believe" that she, Elbaum, and Hochstein "could not work through the difficulties created as the result of" Henninger's misconduct charge. Filing 44–1 at 6. But whatever the plaintiff might have believed, she had already been injured—the retaliation that is the gravamen of her constitutional claims had already occurred. Those claims had accrued, and she could have sued, at that time, even though the full extent of her damages had not yet been incurred. Simply put, she was on notice that her continued participation in the Ph.D. program was jeopardized—and more to the point, she had already been retaliated against.

The plaintiff also claims that accrual of the statute of limitations was delayed by the "continuing violation doctrine." *See* filing 43 at 23–25. But a "continuing violation" is generally confined to circumstances where it is appropriate to describe each new day under an objected-to policy as a new or continuing violation of rights, such as in the context of an Eighth Amendment claim for cruel or unusual punishment or a discrimination claim alleging ongoing implementation of a discriminatory wage scheme. *See Montin*, 636 F.3d at 415. And even then, a continuing violation does not excuse a plaintiff from complying with the applicable statute of limitations—it simply allows the plaintiff to include, in an initial complaint, allegedly unconstitutional acts that occurred before the limitations period, provided that at least one of the acts complained of falls within the limitations period. *Zotos v. Lindbergh Sch. Dist.*, 121 F.3d 356, 362 (8th Cir.1997).

The acts that Elbaum, Henninger, and Hochstein are alleged to have committed, however, are discrete, adverse acts of retaliation, and constituted complete acts at the time they occurred. *See id.* None of their complained-of actions fall within the limitations period, and the continuing violation doctrine has not been applied to

such acts. *See id.;* *see also, Montin,* 636 F.3d at 415–16; *High v. Univ. of Minn.,* 236 F.3d 909, 909 (8th Cir.2000).

█ The Court recognizes that there is some logical tension between the conclusion that the continuing violation doctrine does not apply and the conclusion, discussed above, that this case nonetheless involves prospective relief for an ongoing violation of federal law within the meaning of *Ex Parte Young.* But the simple fact is that, as the Tenth Circuit has explained, the two doctrines serve different purposes. *Rounds v. Clements,* 495 Fed.Appx. 938, 940–41 (10th Cir.2012). Accrual rules tell us when a plaintiff has discovered enough facts to allow a claim to be brought, with the aim of ensuring that claims are promptly pursued and plaintiffs do not sleep on their rights. *Id.* The *Ex Parte Young* doctrine, on the other hand, seeks to give force to the Supremacy Clause by stopping ongoing violations of federal law. *Id.* That someone may have discovered all the elements necessary to bring a claim and need to get that claim to court in a timely fashion does not speak to the scope of the effort necessary to give effect to the Supremacy Clause. *Id.* Simply put, a discrete act may serve to start the statute of limitations running and still—even if not succeeded by other acts—form the basis of an "ongoing violation" for *Ex Parte Young* purposes. *See, id.; Cox v. Shelby State Cmty. Coll.,* 48 Fed.Appx. 500 (6th Cir. 2002).

█ The plaintiff also suggests that the doctrine of equitable estoppel might apply, because various University faculty and officials tried working with the plaintiff to permit her to continue pursuing a Ph.D. Filing 43 at 21. This, the plaintiff suggests, may have been intended to delay the plaintiff's filing of a legal action, warranting equitable estoppel. Filing 43 at 21. But equitable estoppel is a tolling doctrine that, unlike accrual, is determined by reference to state law. *Wallace,* 549 U.S. at 393–94, 127 S.Ct. at 1098; *Montin,* 636 F.3d at 413. And under Nebraska law, equitable estoppel is not available here.

█ There are six elements that must be satisfied for the doctrine of equitable estoppel to apply: (1) conduct which amounts to a false representation or concealment of material facts or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; (3) knowledge, actual or constructive, of the real facts; (4) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (5) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (6) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel. *Woodard v. City of Lincoln,* 256 Neb. 61, 588 N.W.2d 831, 836 (1999). There is nothing in the record here to suggest that University officials (much less the individual-capacity defendants against whom these claims are directed) concealed or falsely represented the facts. *Compare id.* at 837. This is, at most, a situation where mere attempts to settle were made—a situation in which estoppel will not lie. *See id.*

█ In short, the plaintiff's constitutional claims against Elbaum, Henninger, and Hochstein are time-barred. The same general reasoning applies to the plaintiff's state-law tort claims. Nebraska follows the same general rule discussed above, that a statute of limitations begins to run as soon as the claim accrues, and an action in tort accrues as soon as the act or

omission occurs. *Alston v. Hormel Foods,* 273 Neb. 422, 730 N.W.2d 376, 385–86 (2007). As discussed above, that was outside the statute of limitations for each of these defendants. And while there is a "continuing tort doctrine" under state law, it similarly requires that a tortious act—not simply the continuing ill effects of prior tortious acts—fall within the limitations period. *Id.* at 381. "Nor can the necessary tortious act merely be the failure to right a wrong committed outside the statute of limitations, because if it were, the statute of limitations would never run because a tort-feasor can undo all or part of the harm." *Id.* at 381–82. As previously explained, the plaintiff has not presented anything showing that Elbaum, Henninger, or Hochstein committed a tortious act within the limitations period, and any failure to remedy a previously inflicted injury does not serve to delay accrual of the tort. So, the plaintiff's state-law tort claims against those defendants are also time-barred, and their motions for summary judgment will be granted as to the plaintiff's tort claims against them.

IT IS ORDERED:

1. The defendants' motions for judgment on the pleadings (filings 15 and 21) will be granted in part and in part denied:

 a. The plaintiff's constitutional claims against Espy and Paul in their official capacities are dismissed for failure to state a claim;

 b. The plaintiff's constitutional claims against Espy, Goddard and Paul in their individual capacities are dismissed based on qualified immunity;

 c. The plaintiff's breach of contract claim is dismissed as to all defendants in their individual capacities for failure to state a claim, and in their official capacities based on Eleventh Amendment immunity;

 d. The plaintiff's emotional distress claims are dismissed as to Espy, Goddard, and Paul in their individual capacities for failure to state a claim, and in their official capacities based on Eleventh Amendment immunity;

 e. The motions will be denied as moot with respect to the plaintiff's constitutional and emotional distress claims against Elbaum, Hochstein, and Henninger in their individual and official capacities;

 f. Goddard's motion for judgment on the pleadings (filing 15) will be denied with respect to the plaintiff's constitutional claim against him in his official capacity.

2. The defendants' motions for summary judgment (filings 17 and 22) will be granted in part and in part denied:

 a. The plaintiff's constitutional and emotional distress claims are dismissed as to Elbaum, Henninger, and Hochstein in their individual and official capacities based on the statute of limitations;

 b. The motions are denied as moot with respect to the plaintiff's breach of contract claim.

3. The plaintiff may proceed with her constitutional claims against Goddard in his official capacity, limited to seeking injunctive relief.[9]

---

9. The Court cannot help but note that the plaintiff seems to be concerned, first and foremost, with the opportunity to complete her degree. And Goddard is a department chair at a university that is in the business of providing students with such opportunities. It is difficult to conceive that some sort of mutually beneficial agreement may not be attainable.