# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 29, 2017        Decided November 28, 2017

No. 16-5194

LAURA HOLMES AND PAUL JOST,
APPELLANTS

v.

FEDERAL ELECTION COMMISSION,
APPELLEE

On Certification of a Constitutional Question
from the United States District Court
for the District of Columbia
(No. 1:14-cv-01243)

*Allen Dickerson* argued the cause and filed the briefs for appellants. *Owen D. Yeates* entered an appearance.

*Erin Chlopak*, Acting Assistant General Counsel, Federal Election Commission, argued the cause for appellee. With her on the brief were *Lisa J. Stevenson*, Deputy General Counsel, *Kevin Deeley*, Associate General Counsel, and *Steve N. Hajjar* and *Charles Kitcher*, Attorneys.

*J. Gerald Hebert*, *Fred Wertheimer*, and *Donald J. Simon* were on the brief for *amici curiae* Campaign Legal Center and Democracy 21 in support of appellee.

Before: GARLAND, *Chief Judge*, and HENDERSON, ROGERS, TATEL, BROWN\*, GRIFFITH, KAVANAUGH, SRINIVASAN, MILLETT, PILLARD, and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

SRINIVASAN, *Circuit Judge*: The Federal Election Campaign Act imposes limits on the amounts that an individual may contribute to a candidate for federal office. 52 U.S.C. § 30116(a)(1)(A). Those contribution ceilings, known as FECA's base limits, aim to prevent the appearance or actuality of corruption associated with large campaign contributions to federal office holders and candidates.

In 2014, FECA's base limits permitted contributions of up to $2,600 to a candidate in each election in which she competed. So, for instance, if a candidate prevailed in a primary election and then competed in the general election, a donor could have contributed $2,600 to her for the primary and another $2,600 for the general. The same $2,600 ceiling would also have applied to any runoff election in which the candidate took part.

The plaintiffs in this case wished to make contributions to a candidate in the general election in amounts exceeding the $2,600 per-election limit. In particular, they sought to forgo making any contributions at all in the primary election but then effectively to carry over to the general election the amount they could have donated in the primary. That would have enabled them to contribute $5,200 to a candidate in the general election alone, double the applicable limit for that election.

---

\* Circuit Judge Brown was a member of the en banc court but retired before issuance of this opinion.

Prohibited by FECA from doing so, plaintiffs brought an action challenging the constitutionality of the statute's base limits on individual contributions to candidates. According to plaintiffs, FECA violates their First Amendment rights by allowing separate contributions to a candidate in the primary and general elections of $2,600 each, but disallowing a contribution in a corresponding total amount of $5,200 if confined to the general election alone.

Plaintiffs' argument amounts to a challenge to Congress's choice to structure the base contribution limits for individuals as per-election ceilings. When establishing those limits, Congress had to pick *some* temporal frame of reference: a contribution ceiling, to be effective, must specify not only a maximum contribution amount (e.g., $2,600) but also a timeframe in which that amount may be expended (e.g., $2,600 in each election). Plaintiffs, in contending that they must be permitted to contribute twice the maximum amount in one (general) election if they skip any contribution in a different (primary) election, necessarily contest Congress's choice of a per-election ceiling.

We decline plaintiffs' invitation to upend the per-election structure of FECA's base limits on individual contributions to candidates. The Supreme Court, in *Buckley v. Valeo*, 424 U.S. 1 (1976), rejected a constitutional challenge to those ceilings, and that holding remains undisturbed. The Court explained that, as long as a contribution limit is not so low as to prevent candidates from mounting effective campaigns, the judiciary would generally defer to Congress's determination of the limit's precise amount. We conclude the same is true of Congress's intertwined choice of the timeframe in which that amount may be contributed. As a result, we reject plaintiffs' challenge to Congress's decision to fashion FECA's base contribution limits for individuals as per-election ceilings.

3

I.

The Federal Election Campaign Act (FECA) restricts the amounts that an individual may contribute to any federal candidate or political (e.g., party) committee. 52 U.S.C. § 30116(a)(1). Those limits on a person's contributions to a particular candidate or political committee are referred to as FECA's "base" limits, as distinguished from the statute's "aggregate" limits on a person's overall contributions to all candidates or political committees, collectively. The Supreme Court invalidated FECA's aggregate limits in *McCutcheon v. FEC*, 134 S. Ct. 1434 (2014), but the base limits remain intact.

The base limits on contributions to federal candidates operate on a per-election basis, whereas the base limits on contributions to political committees operate on an annual basis. 52 U.S.C. § 30116(a)(1). This case concerns the per-election ceiling on individual contributions to candidates.

A.

Originally, Congress limited an individual's contributions to federal candidates solely through an aggregate, $5,000 ceiling on donations "during any calendar year." Hatch Act Amendments of 1940, Pub. L. No. 76-753, § 13(a), 54 Stat. 767, 770. In 1974, Congress amended FECA to add the base limits on contributions to candidates that are at issue here. *See* Federal Election Campaign Act Amendments of 1974, Pub. L. No. 93-443, § 101(a), 88 Stat. 1263, 1263.

Those base limits differed from the original ceiling on individual contributions to candidates in two ways. First, whereas the original ceiling had been an aggregate limit on a person's collective contributions to all candidates, Congress fashioned the base limits as a cap on the amount of

contributions to any individual candidate. Second, and of particular relevance here, whereas the aggregate limits operated as an annual ceiling, Congress structured the base limits on individual contributions to candidates as a per-election ceiling. And Congress defined an "election" to include any "general, special, primary, or runoff election." Federal Election Campaign Act of 1971, Pub. L. No. 92-225 § 201, 86 Stat. 3, 8. The result was that the base limits, as enacted in 1974, imposed a $1,000 ceiling on a person's contributions to any given candidate in any given election. 88 Stat. at 1263.

In 2002, Congress increased the base contribution limit to $2,000 per election and indexed it to inflation for future cycles. Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, § 307(a), (d), 116 Stat. 81, 102-03 (codified as amended at 52 U.S.C. § 30116(a)(1)(A), (c)). Congress also kept in place (and increased) the aggregate limit on an individual's contributions to all federal candidates. *See id.* § 307(b) (codified at 52 U.S.C. § 30116(a)(3)(A)). But that aggregate ceiling, as noted, was set aside by the Supreme Court in *McCutcheon*, 134 S. Ct. 1434. The Court, though, expressly left the base limits "undisturbed." *Id.* at 1451 (plurality opinion). (Because the plurality in *McCutcheon* issued the controlling opinion, *see Marks v. United States*, 430 U.S. 188, 193-94 (1977), we will treat that opinion as the opinion of the Court.)

When the Court decided *McCutcheon* in 2014, the base limits, as adjusted for inflation, allowed an individual to contribute up to $2,600 per election to a given candidate. *See* 134 S. Ct. at 1442. While the base limits have increased to $2,700 in the intervening years, *see* Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold, 82 Fed. Reg. 10,904, 10,906 (Feb. 16, 2017), we will consider $2,600 as the operative per-

5

election limit because 2014 is the relevant election cycle for purposes of this case.

## B.

The plaintiffs in this case, Laura Holmes and Paul Jost, are a married couple residing in Florida. In the 2014 congressional elections, plaintiffs each supported a different candidate, one of whom ran for a California seat and the other of whom ran for an Iowa seat.

Plaintiffs made no contributions to their preferred candidates in the primary election. But they both contributed the maximum amount then permitted by FECA, $2,600, to their preferred candidates in the general election. And both would have contributed an additional $2,600 in the general election if not for FECA's per-election contribution ceiling. Plaintiffs' preferred candidates each lost in the general election.

FECA enables any eligible voter to challenge the constitutionality of the Act in federal district court. 52 U.S.C. § 30110. In July 2014, plaintiffs brought this action against the Federal Election Commission. They alleged that FECA's per-election base contribution limit violates the First Amendment and the equal protection component of the Fifth Amendment. That was so, plaintiffs contended, because the per-election limit allows contributing $2,600 to a candidate in each of the primary and general elections but bars contributing the same cumulative amount of $5,200 if allocated entirely to the general election.

FECA calls for a district court to certify non-frivolous constitutional questions to the en banc court of appeals. 52 U.S.C. § 30110; *Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 192 n.14 (1981). The district court determined that plaintiffs'

constitutional challenges involved "questions of settled law" and thus did not warrant certification to our court. *Holmes v. FEC*, 99 F. Supp. 3d 123, 149 (D.D.C. 2015). A panel of this court disagreed with respect to plaintiffs' First Amendment claim, holding that no Supreme Court precedent squarely addressed the "constitutionality of the Act's per-election structure" for contributions to candidates. *Holmes v. FEC*, 823 F.3d 69, 75 (D.C. Cir. 2016). The panel therefore remanded the case to the district court to make appropriate findings of fact and certify the relevant constitutional question to this court sitting en banc. *Id.* at 76.

On remand, the district court certified its previous factual findings, together with the following question, for our en banc consideration:

> When federal law limits individual contributors to giving $2,600 to a candidate for use in the primary election and $2,600 to a candidate for use in the general election and denies Plaintiffs the ability to give $5,200 to a candidate solely for use in the general election, does it violate Plaintiffs' rights of freedom to associate guaranteed by the First Amendment, U.S. Const. amend. I?

Am. Order, ECF No. 42. We now take up that question.

## II.

In *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court upheld FECA's base contribution limits for individuals against a First Amendment challenge. Plaintiffs seek to distinguish their claim from the one denied in *Buckley* by arguing that the Supreme Court did not specifically consider the validity of the per-election structure of those limits. We conclude, however,

that the analysis in *Buckley* ultimately governs—and compels rejecting—plaintiffs' challenge to the per-election structure of FECA's base limits.

In fashioning FECA's base limits for individuals as per-election ceilings, Congress mirrored the approach adopted by many states: the vast majority of states to establish contribution ceilings for state elections have likewise opted for a per-election format. *See* Amicus Br. of Campaign Legal Ctr. 18-19. In plaintiffs' view, Congress and the states are forbidden to make that choice. We hold otherwise.

A.

In *Buckley*, the Supreme Court set out the standards for judicial review of campaign-finance regulations challenged under the First Amendment. The Court drew a distinction between limits on a person's expenditures for election-related advocacy and limits on a person's contributions to candidates (or party committees). Restrictions on a person's independent expenditures must survive "strict scrutiny," which requires that the limitations advance a compelling governmental interest and constitute the least restrictive means of doing so. *See McCutcheon*, 134 S. Ct. at 1444; *Buckley*, 424 U.S. at 44-45; *Wagner v. FEC*, 793 F.3d 1, 5 (D.C. Cir. 2015) (en banc). Restrictions on a person's campaign contributions, meanwhile, draw "a lesser but still 'rigorous standard of review.'" *McCutcheon*, 134 S. Ct. at 1444 (quoting *Buckley*, 424 U.S. at 29).

Contribution limits are subject to a more relaxed standard because they "impose a lesser restraint on political speech": they "permit[] the symbolic expression of support evidenced by a contribution but do[] not in any way infringe the contributor's freedom to discuss candidates and issues." *Id.* at

1444 (quoting *Buckley*, 424 U.S. at 21). Under the applicable standard for contribution limits, "[e]ven a significant interference with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means *closely drawn* to avoid unnecessary abridgement of associational freedoms." *Id.* (emphasis added) (internal quotation marks omitted) (quoting *Buckley*, 424 U.S. at 25); *see Wagner*, 793 F.3d at 5.

*Buckley*, applying that "closely drawn" standard, sustained FECA's base limits on individual contributions to candidates against a First Amendment challenge. At the time, FECA imposed a $1,000 ceiling on a person's contributions to a given candidate in each election. *See Buckley*, 424 U.S. at 23. Then, as now, the statute treated primary elections, general elections, and runoff elections as distinct events for purposes of the per-election contribution ceiling. *See id.* at 24; 52 U.S.C. § 30101(1)(A), § 30116(a)(1)(A), (a)(6).

The Court found it "unnecessary to look beyond the Act's primary purpose—to limit the actuality and appearance of corruption resulting from large individual financial contributions—in order to find a constitutionally sufficient justification for the $1,000 contribution limitation." 424 U.S. at 26. The Court explained that the "$1,000 contribution limitation focuses precisely on the problem of large campaign contributions—the narrow aspect of political association where the actuality and potential for corruption have been identified—while leaving persons free to engage in independent political expression." *Id.* at 28.

The Court also rejected the contention "that the $1,000 restriction is unrealistically low because much more than that amount would still not be enough to enable an unscrupulous contributor to exercise improper influence over a candidate or

officeholder, especially in campaigns for statewide or national office." *Id.* at 30. In that regard, the Court noted that FECA's then-existing limits on expenditures (as opposed to the limits on contributions) were "scaled to take account of the differences in the amounts of money required for congressional and Presidential campaigns." *Id.* at 30 n.32. While the contribution limits might "have been structured" in a similarly "graduated" way depending on the office sought—instead of taking the form of a flat, $1,000 ceiling regardless of office— "Congress' failure to engage in such fine tuning [did] not invalidate the legislation." *Id.* at 30.

B.

In light of the Supreme Court's decision in *Buckley*, plaintiffs here understandably "concede the constitutionality of contribution limits generally." Plaintiffs' Opening Br. 9. They also "do not challenge the specific dollar amount Congress has chosen." *Id.* at 12. That, too, is with good reason: the $2,600 base contribution limit applicable to plaintiffs represents an updated version of the $1,000 ceiling sustained in *Buckley*.

Plaintiffs instead characterize their claim as contesting "only the manner in which the total amount of money that Congress has said will not corrupt a candidate is split between the primary and general elections." *Id.* at 12-13. That claim, in plaintiffs' view, remains viable after *Buckley*. Plaintiffs' elaboration of their claim proceeds in the following steps.

First, plaintiffs describe FECA as imposing an "overall $5,200 cap on contributions," which they conceive to be the statute's "base limit." *Id.* at 9, 19. Second, they contend that the statute's "artificial bifurcation" of that ostensible limit into separate, $2,600 ceilings for the primary and general elections must itself combat corruption in a manner satisfying the

"closely drawn" standard applicable to contribution limits. Plaintiffs' Reply Br. 1, 12. Third, plaintiffs argue that the bifurcation between the primary and general elections cannot be sustained because the statute permits—and hence considers non-corrupting—a total of $5,200 in contributions over those two elections. As a result, plaintiffs submit, they cannot be forced to divide their desired $5,200 contribution between the primary and general elections.

Plaintiffs' argument falls short at every step. Their challenge ultimately seeks to invalidate the per-election structure of FECA's base contribution limits for individuals. Plaintiffs would prefer a version of an election-cycle ceiling (of $5,200) to the per-election ceiling (of $2,600) chosen by Congress. But just as the Supreme Court in *Buckley* declined to overturn Congress's choice of a $1,000 contribution ceiling over a higher ceiling, we see no basis to upset Congress's choice of a per-election ceiling over a per-cycle ceiling.

1.

The starting premise of plaintiffs' argument is that FECA imposes a $5,200 base limit on a person's contributions to a candidate, which the statute, as plaintiffs see things, artificially bifurcates between the primary and general elections. Plaintiffs' understanding of FECA is fundamentally mistaken.

Contrary to plaintiffs' account of FECA, there is no $5,200 base contribution ceiling split between the primary and general elections. Instead, the Act by its terms establishes a $2,000 contribution limit, adjusted for inflation, which "shall apply separately with respect to each election." 52 U.S.C. § 30116(a)(1)(A), (a)(6). The statute then defines an "election" to include a primary election or general election (and also, if applicable, a runoff election). *Id.* § 30101(1)(A). As a result,

FECA does not establish any overarching $5,200 ceiling that is then divided into separate $2,600 caps for the primary and general elections. The statute, rather, simply imposes a $2,600 base limit for each of those (and any other) elections.

To be sure, the upshot of the $2,600 per-election base limit is that, if a person contributes the maximum amount to a candidate who competes in both a primary and a general election, the combined contributions would equal $5,200. The Supreme Court thus has referred to a "$5,200 base limit" as shorthand for the total contributions permitted across a primary and general election together. *McCutcheon*, 134 S. Ct. at 1452. But the Court specifically understood that the $5,200 figure is only an extrapolation of the statute's actual base limit, i.e., $2,600 per election: the Court explained that FECA's "base limits . . . permit an individual to contribute *up to $2,600 per election* to a candidate ($5,200 total for the primary and general elections)." *Id.* at 1442 (emphasis added).

The absence of any $5,200 base limit in the statute becomes particularly evident when one considers the potential implications of a runoff election. That is hardly an unpredictable occurrence. In the 2014 election cycle alone, 15 congressional races included at least one runoff election, and in the decade culminating in the 2014 cycle, 95 congressional races involved a runoff election. *Holmes*, 99 F. Supp. 3d at 133. Because FECA's $2,600 per-election ceiling applies separately to any runoff election, the permissible contributions to a candidate who competes in a primary, runoff, and general election would reach $7,800—not just $5,200—over the course of an election cycle.

The statute, in short, imposes a $2,600 per-election limit, not any $5,200 (or $7,800) limit. Accordingly, when plaintiffs challenge what they characterize as the "per-election division"

or "bifurcation" of the supposed $5,200 base limit, Plaintiffs' Opening Br. 9, 13, they in fact challenge the per-election structure of the $2,600 base limit. They would like to contribute $5,200 to a candidate in the general election alone, which the $2,600 per-election cap forbids them from doing.

2.

Plaintiffs argue that Congress's choice of a per-election structure must itself advance an anti-corruption interest under the "closely drawn" test set out in *Buckley*. Plaintiffs do not dispute that the $2,600 base contribution limit, as a general matter, serves to prevent corruption (or its appearance) in satisfaction of that standard. But they conceive of the limit's per-election structure as an added restriction that must separately promote an anti-corruption objective.

Plaintiffs ground their understanding in the Supreme Court's decision in *McCutcheon*. There, the Court invalidated FECA's aggregate contribution limits, reasoning that those ceilings afforded no additional anti-corruption benefit beyond the base limits. The Court observed that the base limits had been "upheld [in *Buckley*] as serving the permissible objective of combatting corruption." 134 S. Ct. at 1442. And although the government "contend[ed] that the aggregate limits also serve that objective," the Court found "that the aggregate limits do little, if anything, to address that concern." *Id.* The Court further noted that the base limits "themselves are a prophylactic measure." *Id.* at 1458. The "aggregate limits are then layered on top, ostensibly to prevent circumvention of the base limits." *Id.* But because the aggregate limits did not in fact serve that purpose, the "prophylaxis-upon-prophylaxis approach" they embodied was deemed invalid. *Id.*

Plaintiffs seek to draw a parallel between the per-election structure at issue here and the aggregate limits examined in *McCutcheon*. They contend that, like the aggregate limits, the per-election structure of the base contribution ceilings "is not closely drawn" unless it "is targeted toward a risk of corruption that is not already addressed by the contribution limits in general." Plaintiffs' Opening Br. 16. And the per-election structure of those ceilings, plaintiffs submit, fails to advance the anti-corruption interest in any way not already accomplished by the base limits. Plaintiffs thus conclude that, "like the unconstitutional aggregate limits at issue in *McCutcheon*, the bifurcated [i.e., per-election] limits are 'layered on top' of base limits that themselves . . . combat corruption" only indirectly, amounting to an invalid "prophylaxis-upon-prophylaxis" approach of the kind rejected in *McCutcheon*. *Id.* at 24.

Plaintiffs' effort to analogize the base limits' per-election structure to the aggregate ceilings considered in *McCutcheon* is misconceived. The aggregate limits were an additional constraint "layered on top" of the base limits, *McCutcheon*, 134 S. Ct. at 1458, and thus separately needed to serve the interest in preventing the appearance or actuality of corruption. The contribution ceilings' per-election structure, by contrast, is not layered on top of the base limits; it is an integral part of the base limits themselves.

A contribution limit necessarily contains two essential ingredients: (i) a monetary cap, and (ii) a time period. A statute simply specifying that contributions may be made "annually," without setting forth any monetary ceiling, would of course be entirely ineffectual (and nonsensical): it would seemingly allow contributions of any amount within a given year. Likewise, a statute capping contributions at $2,600, without identifying any associated timeframe, would be equally

ineffectual: it would seemingly allow repeated contributions of $2,599 without end.

To impose a meaningful contribution ceiling, then, Congress has no choice but to specify *some* time period in which donors can contribute the maximum amount. There are a host of alternatives in that regard.

Congress could impose an annual ceiling, as it did with FECA's base limits on contributions to political committees. *See id.* at 1442; 52 U.S.C. § 30116(a)(1)(B)-(D). Congress could also establish a biennial cap, as with the aggregate limits considered in *McCutcheon*. *Id.* § 30116(a)(3). Congress could instead fashion a limit encompassing an election cycle, as with the per-cycle regime favored by plaintiffs and adopted by certain states. *E.g.*, Ariz. Rev. Stat. Ann. § 16-912(A); Md. Code Ann., Elec. Law § 13-226(b); Vt. Stat. Ann. tit. 17, § 2941(a)(1)-(3). Or Congress could impose a ceiling for each election, as with the $2,600 per-election limit we consider here, or with the per-election caps enacted by the majority of states, *see* Amicus Br. of Campaign Legal Ctr. 18-19.

Congress's choice of a per-election structure thus is not a "prophylaxis-upon-prophylaxis"—a second anti-corruption measure layered on top of the base limits. Instead, the per-election structure is an essential ingredient of the base limits themselves—the first layer of prophylaxis. Unlike in *McCutcheon*, then, there is no warrant for attempting to ascertain whether the per-election timeframe of the $2,600 base limit *itself* combats corruption. Rather, it is enough if that base limit as a whole (of which its time period is an integral element) prevents the appearance or actuality of corruption in a manner satisfying the closely drawn standard.

The Supreme Court's analysis in *Buckley* bears out that understanding. There, the Court applied the closely drawn standard to the $1,000 per-election base contribution ceiling then in existence. 424 U.S. at 24-29. The Court concluded that the $1,000 base limit advanced the "weighty interests" in combatting corruption or its appearance in a manner "sufficient to justify the limited effect upon First Amendment freedoms." *Id.* at 29. The Court found "no indication" that the $1,000 ceiling established by Congress would "prevent[] candidates" from "amassing the resources necessary for effective advocacy." *Id.* at 21; *see Randall v. Sorrell*, 548 U.S. 230, 247-49 (2006) (plurality opinion) (discussing *Buckley*).

Having generally sustained the base limit under the closely drawn standard, the Court then examined whether the across-the-board, $1,000 ceiling was too low as applied to certain elections for which a higher ceiling would still prevent corruption (such as campaigns for statewide or national office, which typically require greater amounts of funding). *Buckley*, 424 U.S. at 30. In addressing that question, the Court did not ask whether Congress's choice of a flat, $1,000 limit—instead of a graduated scheme allowing for higher ceilings for certain elections—itself advanced the anti-corruption interest under the closely drawn test. The Court instead explained that, once it was "satisfied that some limit on contributions is necessary" to address corruption, it had "no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000." *Id.* (quoting *Buckley v. Valeo*, 519 F.2d 821, 842 (D.C. Cir. 1975)). That was a "distinction[] in degree," not a "difference[] in kind." *Id.*

The same is true of Congress's choice of a per-election cap rather than a per-cycle, annual, or biennial one. Just as *Buckley* did not require Congress to explain its choice of $1,000 rather than $2,000 as itself closely drawn to preventing corruption,

we see no basis for requiring Congress to justify its choice concerning the other essential element of a contribution limit— its timeframe—as itself serving that interest. A contribution ceiling, we know from *Buckley*, can validly promote an anti-corruption objective, at least as long as it is not so low as to prevent effective campaigns. If so, Congress need not justify its exact choice as to the ceiling's time period (or dollar amount) with some added anti-corruption explanation.

3.

Even if the per-election structure of FECA's $2,600 base limit need not separately *advance* the limit's anti-corruption objective, plaintiffs argue, allowing them to exceed that amount at least would not *undermine* that objective. As a result, plaintiffs reason, they should be permitted to contribute $5,200 in the general election. They stress that the $2,600 per-election ceiling would allow cumulative contributions of $5,200 to a candidate who participates in both the primary and general elections. If $5,200 in contributions across both elections raises no undue prospect of corruption, plaintiffs ask, then what could be the reason to disallow the same overall contribution across the elections merely because it is paid in the general election alone?

Congress had a perfectly understandable reason: Congress, needing to select *some* timeframe in order to establish an effective base contribution limit, chose a per-election structure and reasonably defined the primary and general elections as separate events for purposes of the $2,600 ceiling. Enforcement of the $2,600 per-election limit necessarily means that a person cannot be allowed to contribute twice that amount to a candidate in the general election alone.

17

Plaintiffs' challenge, though, would prohibit giving effect to that per-election ceiling anytime a person contributes less than $2,600 to a candidate in the primary election. Such a person, under plaintiffs' rationale, would be entitled to contribute more than the $2,600 per-election cap in the general election, up to a combined contribution of $5,200 for both the primary and general elections. So someone who makes no contribution in the primary could contribute the full $5,200 in the general election, someone who gives $1,000 in the primary could contribute the remaining $4,200 in the general election, and so on.

Plaintiffs' rationale, in that fashion, would effectively transform the per-election, $2,600 contribution limit chosen by Congress into a per-cycle, $5,200 contribution limit, at least in the case of a person who contributes less than $2,600 in the primary. Plaintiffs insist that they do not desire a pure, per-cycle structure. They observe that, while they wish to contribute up to $5,200 in the general election, they have no reciprocal interest in contributing up to $5,200 in the primary election, as would also be permitted in a pure, per-cycle regime. In other words, they seek only to backload their desired $5,200 contribution, not frontload it.

Regardless, plaintiffs at least seek a variant of a per-cycle ceiling—a back-loaded adaptation—under which they can give up to $5,200 in the general election by carrying over any amounts that could have been (but were not) contributed in the primary. Plaintiffs thus would displace Congress's per-election structure with a version of a per-cycle structure.

We know of no reason to compel adoption of a per-cycle ceiling instead of a per-election one (or vice versa). After all, a contribution limit, whether structured as a per-election or per-cycle ceiling, generally addresses the appearance and actuality

of corruption from large campaign donations. Plaintiffs make no attempt to suggest that a per-cycle approach bears some inherent structural advantage on that score. The many states to have chosen per-election contribution ceilings evidently believe otherwise. *Cf. McCutcheon*, 134 S. Ct. at 1451 n.7 ("It would be especially odd to regard aggregate limits as essential to enforce base limits when state campaign finance schemes typically include base limits but not aggregate limits.").

Moreover, even if there were some ground compelling us to transform Congress's $2,600 per-election ceiling into a per-cycle analogue, we could not assume that Congress necessarily would have chosen a per-cycle cap of $5,200. Congress could conceivably regard a one-time contribution of $5,200 in the general (or primary) election alone to present a greater risk of apparent or actual corruption than two distinct contributions of $2,600 in each of the primary and general elections. For that reason as well, we have no basis for converting FECA's $2,600 per-election ceiling into a form of a $5,200 per-cycle ceiling.

While those are reasons enough to reject plaintiffs' argument, their rationale would not just call for shifting a $2,600 per-election limit into a variant of a $5,200 per-cycle ceiling. Their argument would ultimately support an attack on contribution limits generally.

To start with, in the event of a run-off election to determine the winner of a party primary, a per-election cap of $2,600 would permit total contributions of $7,800 to a candidate who took part in a primary, runoff, and general election. Under plaintiffs' argument, then, a person who made no contributions to a candidate before the general election should be permitted to give at least triple the limit—i.e., $7,800, not just $5,200—in that election. Indeed, at least one state provides for runoffs to determine the winners of both primary and general elections,

meaning that a candidate could participate in four elections in a single cycle. Ga. Code Ann. § 21-2-501. Donors in that state, under plaintiffs' approach, should be able to contribute $10,400 to such a candidate in the last of the four elections if they have made no donations to her until then.

But the logic of plaintiffs' theory goes further still. Their rationale not only supports a per-cycle limit of $7,800 (or even $10,400) rather than $5,200, but it also has no necessary stopping point with a given election cycle. While plaintiffs may not claim an entitlement to roll over potential contributions from election cycle to election cycle, their theory could support doing so.

Consider, for instance, an incumbent congresswoman seeking reelection for a second term. Across her two election cycles, a $2,600 per-election ceiling would permit total contributions to her of $10,400 (or $15,600 with one runoff election in each cycle, or even $20,800 with two runoffs in each cycle). For a person who made no contributions to her in her first campaign, plaintiffs' theory could call for allowing a contribution of $10,400 (or $15,600, or $20,800) in the second election cycle. And the same rationale, if pushed to its extreme, could even encompass a single contribution of many tens of thousands of dollars to a candidate when taking into account the total amounts that could be donated to her over the course of her (potentially decades-long) political career.

Even assuming plaintiffs' theory need not stretch that far, their rationale does more than merely challenge the per-election structure of FECA's $2,600 base contribution limit. It calls into question the enforceability of any contribution ceiling, regardless of its timeframe. Plaintiffs' theory assumes a contributor's entitlement to roll over amounts that he could (but does not) give. If so, any contribution limit, no matter its

timeframe, must permit donations exceeding its cap if a person withholds contributions: a per-election ceiling must allow giving double the cap in the second election, an annual ceiling must do the same in the second year, a per-cycle ceiling must do likewise in the second cycle, and so forth.

The logic of plaintiffs' challenge therefore extends to any contribution ceiling, not just the per-election structure chosen by Congress for FECA's base contribution limits for individuals. Such a theory cannot be reconciled with *Buckley*'s general approval of contribution limits as adequately suited to combatting the appearance or actuality of corruption.

Still, a contribution ceiling's timeframe is not entirely immune to challenge under the First Amendment. A limit's time period, like its monetary cap, cannot give rise to a contribution ceiling so low as to "harm the electoral process by preventing challengers from mounting effective campaigns." *Randall*, 548 U.S. at 249 (plurality opinion); *see Buckley*, 424 U.S. at 21.

In *Randall*, the Supreme Court therefore invalidated Vermont's per-cycle contribution ceilings, which ranged from $200 to $400 depending on the office. The plurality (and controlling) opinion, noting *Buckley*'s refusal to scrutinize the difference between a $1,000 and $2,000 per-election ceiling, observed that "ordinarily we have deferred to the legislature's determination of such matters." 548 U.S. at 248. But contribution limits can be "too low and too strict" if they "prevent candidates from 'amassing the resources necessary for effective [campaign] advocacy'" or "magnify the advantages of incumbency to the point where they put challengers to a significant disadvantage." *Id.* at 248 (quoting *Buckley*, 424 U.S. at 21). The per-cycle ceiling examined in *Randall*, which contained no adjustment for inflation,

amounted to "slightly more than one-twentieth of the limit on contributions . . . before the Court in *Buckley*." *Id.* at 250. That, to the Court, constituted a "difference in kind" rather than just "in degree." *Id.* at 260.

That is untrue of the $2,600 per-election contribution limit we consider here. Plaintiffs do not contend otherwise. They do not argue that the contribution ceiling is "too low" to permit an effective campaign. *Id.* at 248. That is, they "do not challenge the specific dollar amount Congress has chosen" for the per-election limit. Plaintiffs' Opening Br. 12.

Plaintiffs instead accept FECA's $2,600 contribution limit as a given. They argue that Congress, having established a $2,600 per-election ceiling, must allow a contributor to treat that limit as if it were effectively a $5,200 per-cycle ceiling. For all the reasons explained, we reject plaintiffs' First Amendment challenge to the statute's per-election structure.

4.

Plaintiffs do not suggest that Congress's choice of a per-election structure is otherwise arbitrary. Nor could they make any such argument.

A per-election ceiling promotes the ability of candidates to gain adequate funding for each election in which they must compete. States, in exercising their constitutional authority to "prescribe the time, place, and manner of electing Representatives and Senators," *Arizona v. Inter Tribal Council of Ariz., Inc.*, 133 S. Ct. 2247, 2253 (2013), have adopted varying structures. A state might allow for only a single round of elections, it might adhere to the more conventional structure of a primary election followed by a general election, or it might also provide for runoff elections. *See Holmes*, 99 F. Supp. 3d

at 132-33. A per-election ceiling enables a candidate to raise the same level of funds for each election, regardless of the number of elections in which a given state's regime might call for her to participate. Otherwise, for instance, a candidate might be left with insufficient funds with which to compete in a runoff election.

Relatedly, a per-election framework guards against unduly advantaging candidates (often incumbents) who face little meaningful opposition in a party primary. *See Randall*, 548 U.S. at 268 (Thomas, J., concurring in the judgment). In a per-cycle system, an incumbent confronting no serious primary opponent could more readily conserve contributions for use in the general election, whereas an opponent who competed in a contested primary presumably would have expended considerable resources to survive that stage. A per-election structure, by contrast, is naturally geared to enable candidates to raise equivalent amounts for use in the primary and general elections.

A per-election structure also can be understood to reinforce the First Amendment associational interests embodied in campaign contributions to a candidate. The act of associating with a candidate in a primary election, as compared with a general election, might be seen to concern distinct associational interests: the two elections serve a different purpose, involve a different field of candidates, and frequently feature a discussion of different issues and priorities. Congress, for such reasons, could conclude that affiliating with a candidate in the general election entails a different exercise of associational interests than doing so in the primary election. Contributing to one candidate in the primary election and to another in the general election thus involves a different associational tie than contributing to the same candidate in both. That understanding coheres with a contribution ceiling

that operates separately with respect to each of those elections rather than an overarching, per-cycle ceiling that indistinctly envelops both.

None of this is to say that Congress was obligated to select a per-election structure for FECA's base contribution limits. The question before us is whether Congress *could* choose a per-election format consistent with the First Amendment, not whether it *had* to do so. Congress's choice in that regard was a constitutionally permissible one.

## III.

We finally consider certain regulations promulgated by the Federal Election Commission and invoked by plaintiffs in support of their constitutional challenge to the statute. While those regulations permit commingling of primary-election and general-election contributions in certain circumstances, they do not undermine our conclusion that Congress could choose a per-election structure consistent with the First Amendment.

Plaintiffs point to two regulations. The first permits a contributor to make a single payment of up to $5,200 during the primary election, and then calls for the campaign to refund any amounts above the $2,600 per-election cap or set aside the excess funds for use in the general election (if the candidate advances to that stage). 11 C.F.R. § 110.1(b)(5)(ii)(B). Separately, the second regulation enables a campaign to transfer any unused primary-election funds to the general election. 11 C.F.R. § 110.3(c)(3). Those regulations, taken together, permit an individual to contribute $5,200 at the time of the primary election and then allow the campaign to transfer any or all of the funds for use in the general election.

Plaintiffs do not contest the constitutionality or lawfulness of the regulations in this proceeding. They challenge only the statute. And the theory of their challenge to the statute's per-election structure does not turn on the leeway afforded by the regulations to transfer contributed funds from the primary to the general election. Plaintiffs' argument instead is that, regardless of any such transfers, the First Amendment entitles them to contribute $5,200 to a candidate in the general election if they made no contribution to her in the primary.

Plaintiffs invoke the regulations in questioning whether the statute's per-election ceiling serves any meaningful interest given that, under the regulations, contributions in the primary election may be transferred and spent by the campaign in the general election. We are unpersuaded by plaintiffs' reliance on the regulations.

The first regulation gives a person the convenience of making contributions to a candidate for the primary and general elections in a single, up front, $5,200 payment. The contributor remains fully subject to FECA's per-election ceiling of $2,600, but can make an advance contribution for the general election contemporaneously with any contribution for the primary election. If the candidate fails to proceed to the general election, the contributor is entitled to a refund of any donations exceeding the $2,600 limit for the primary election. *See* 11 C.F.R. § 110.1(b)(5)(ii)(B)(5). That regulation thus is consistent with the statute's $2,600 per-election contribution ceiling for individuals.

The second regulation, which permits campaigns to roll over unused funds, does not speak to an individual's contributions to a campaign. It instead pertains to the expenditure of contributed funds by the campaign, allowing the campaign to transfer unused funds from the primary election to

pay expenses in the general election. 11 C.F.R. § 110.3(c)(3). A contributor does not direct the transfer of primary-election funds to the general election—any decision to do so is an independent one on the part of the campaign.

Insofar as a campaign's latitude to transfer funds from one election to the next could be perceived to impeach the integrity of the statute's per-election structure, that concern would arise from the regulation, not the statute. And even assuming the regulation could be viewed to have the effect in certain circumstances of reshaping the statute's per-election ceiling into a form of a per-cycle limit, that would not afford a basis to invalidate the statute under the First Amendment: a contribution ceiling needs to contain some timeframe, and both a per-election and per-cycle structure, as we have seen, are among the constitutionally permissible options.

\* \* \* \* \*

For the foregoing reasons, we reject plaintiffs' challenge to the per-election structure of FECA's base contribution ceilings for individuals.

*So ordered.*